Railroad v. Hatch.

ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY
COMPANY et al. v. HOWARD HATCH et al.

(*Jackson.* April Term, 1906.)

1. **VERDICT.** For plaintiff for indignities inflicted upon her
   while a passenger in a railroad sleeping car is supported by
   the evidence stated.

   The evidence stated in the opinion is sufficient to support a ver-
   dict for four thousand and five hundred dollars in favor of the
   plaintiff in an action against a railroad company and a sleeping
   car company for indignities and outrages inflicted upon her
   by men while she was a passenger in the sleeper. (*Post, pp.*
   582-590.)

2. **SLEEPING CAR COMPANIES.** Degree of care to be exer-
   cised toward passengers.

   A sleeping car company is required to exercise only ordinary and
   reasonable care and diligence in watching over its passengers
   to protect them from assault and injury. (*Post, p.* 590.)

3. **COMMON CARRIERS.** Degree of vigilance to be exercised
   toward passengers.

   Carriers of passengers are required to exercise a high, if not the
   highest, degree of vigilance to protect their passengers, not only
   from their own employees, but from fellow passengers and from
   strangers. (*Post, p.* 590.)

4. **SAME.** No complaint can be made of error in the charge by
   the party in whose favor the error was made.

   In an action against a railroad company and a sleeping car com-
   pany, based upon their negligence in failing to protect a passen-
   ger, the railroad company cannot complain that the trial judge
   imposed a lower burden upon it, as to the care required toward
   its passengers, than the law would exact. (*Post, pp.* 590, 591.)

Railroad v. Hatch.

5. **SLEEPING CAR COMPANIES.** Cannot complain of error in the charge made in favor of the railroad company jointly sued with it, when not injurious to it.

In an action against a railroad company and a sleeping car company, based upon their negligence in failing to protect a passenger, the sleeping car company cannot complain of a charge imposing a lower burden upon the railroad company, as to the care required for the protection of its passengers, than the law would exact, where such error in favor of the railroad company did not result in injury to the sleeping car company, and where the charge as to the sleeping car company was correct. (*Post, pp.* 590, 591.)

6. **COMMON CARRIERS.** Care required of railroads and sleeping car companies; liability for negligence is not escaped because injury to passengers was not anticipated.

A railroad company and a sleeping car company cannot escape liability for indignities inflicted upon a passenger in the sleeper, upon the ground that there was no reason for supposing that any such wrong would be committed, where their employees were absent from the sleeper for two hours, and failed to answer any of the numerous bell calls, for this is not the exercise of the vigilant care exacted of the railroad company, nor of the reasonable care required of the sleeping car company. (*Post, pp.* 591-593.)

Cases cited and distinguished: Ferry Cos. v. White, 99 Tenn., 263; Connells v. Railroad, 93 Va., 44; Batton v. Railroad, 77 Ala., 591.

7. **CHARGE OF COURT.** Refusal of requests stating theory of one party is not error, where the charge is proper without stating the theory of either party, when.

Where the trial judge properly charges the law so that it is an intelligent guide to the jury in reaching a correct solution of the case, as they might adopt the theory of facts of the plaintiff or of the defendant, his refusal to charge requests embracing the theory of one party is not error, where he did not undertake

to state the theory of either party, even though the propositions of law embodied in the requests are sound. (*Post, p.* 593.)

8. **SUPREME COURT PRACTICE.** Objection to charge not made in motion for new trial will not be considered by the supreme court, when.

Assignments of error as to the charge of the trial judge not called to his attention in the motion for a new trial, as was required by a rule of the court, cannot be considered by the supreme court. (*Post, p.* 593.)

### FROM SHELBY.

Appeal from Circuit Court of Shelby County.— WALTER MALONE, Judge.

MCFARLAND & CANADA and THOS. H. JACKSON, for Railroad Co. and Sleeping Car Co.

EWING & WILLIAMSON, for Hatch.

MR. CHIEF JUSTICE BEARD delivered the opinion of the Court.

Mrs. Hatch, one of the defendants in error, accompanied by three small children, the oldest of them being only five years of age, took passage on a train of the railway company, named above as one of the plaintiffs in error, at Houston, Texas, to make the journey from that point to Memphis, Tennessee. Having a ticket not

Railroad v. Hatch.

only of the railway company, but of the Pullman Company, she took passage in a car of the latter company, constituting a part of the train on which she was a passenger. Her route carried her through Texarkana, Arkansas, which point she reached about ten o'clock at night. There it was necessary for her to change sleepers, she having ridden in a St. Louis sleeper from Houston, Texas, to that place. Traveling without her husband or any male attendant, and having charge of her three small children, a Mr. Tucker, a citizen of Memphis, who was a passenger with her from Houston, aided her in making the change at Texarkana. In the sleeping car to which she was transferred there were three passengers besides herself and her children. When the change was made the berths that were to be occupied by these passengers had already been made up by the porter of the sleeper. She was assigned to the lower berth of section 12. This berth was at the rear of the car, as the train was going towards Memphis, and next to the drawing room. The berth assigned to Mr. Tucker was about the center of the car. Across the aisle from him a lady, whose name is unknown, occupied the lower berth of that particular section.

Immediately upon this change having been made, Mrs. Hatch prepared her children to retire for the night, and placed them in the berth to which her ticket entitled her. Having done this, she took a seat, immediately opposite this berth. Being in delicate health, this seat was taken in order that she might have the benefit of

the fresh air which came through the open window. According to her testimony, she sat there for an hour, and then dropped off to sleep, from which she was suddenly aroused, according to her testimony, by the appearance of two men whom, at the moment, she thought to be robbers. One of these parties had a revolver protruding from his hip pocket, and the other wore a slouch hat and was in his shirt sleeves, having his coat under his arm. She was accosted by these parties, one of whom put his arms around her and made her an indecent proposition. She struggled to get away, and at last, with almost superhuman strength, according to her statement, she broke away from the man and in doing so fell against the car and cut her head. While this was taking place, there was neither conductor nor porter in the car within range of her vision. Mr. Tucker had retired, and the lady opposite was also in her berth. The only other person who was up at that time was a Mr. Polonius, who, according to his statement, was seated in the smoking department and at its further or front end. Mrs. Hatch states that, immediately after she was released, these two men left, going toward the St. Louis sleeper, which was immediately in the rear; that she at once twice rang the bell and no one came to her aid; that she then rushed to Mr. Tucker's berth, calling upon him for assistance, when she saw these men coming back, and as they passed her one of them patted her on the cheek, attempted to put his arms around her, and applied to her terms of endearment.

Railroad v. Hatch.

From this alleged outrage upon her, and its alleged effect upon her sensibilities and health, the present suit was brought; her husband joining as a co-plaintiff. The averments of the declaration cover the statements which she afterward detailed in her testimony as a witness upon the trial of the suit, and were, in substance, as set out above. The gravamen of her complaint is that the plaintiffs in error failed to render her that care and watchfulness with a view to her protection as a passenger which the law exacted of them. Upon the trial of the case, the jury rendered a verdict of $4,500 against the two companies, and, their motions for new trial having been overruled, an appeal in the nature of a writ of error from the judgment rendered on that verdict has been prosecuted by them.

To show negligence upon the part of the two companies, Mrs. Hatch testified that from the time the conductor, immediately after she had entered the sleeper at Texarkana, took up her tickets, until she fell asleep, a period of one hour, no one but the passengers were in the sleeper, and that it was only after these two men disappeared, or were in the act of disappearing, from the car, subsequent to the outrage complained of, she saw the conductor and porter; that not only did she get no response to the bell, which she twice rang, but that, while she sat by the window before falling asleep, the lady in the berth across the aisle from Mr. Tucker rang several times and failed to get a reply from any one in charge of the car. She states that, when she was aroused

from sleep, at least two hours had elapsed from the time of taking her seat by the window, and that it was about twelve o'clock when she called Mr. Tucker. The latter was examined as a witness in the case, and he testified that he never saw Mrs. Hatch before the morning of this incident, and that he helped her with the children from one car to the other at Texarkana, as she had already testified. He then added: "I do not recall the time, but I think it was about half past ten that I retired to my berth, having disrobed as I would have at home, and I was soon asleep. I think it must have been twelve o'clock, it may have been sooner or later, that I heard her voice: 'Oh, Mr. Tucker! Oh, Mr. Tucker! These men are interfering with me.' I was aroused from sound slumber, and did not know what it was, and a moment later I heard the voice right outside of my berth, and I put my head out and said, 'What's the matter?' and I saw two men walking down the aisle, and they had their backs turned toward me, and I spoke pretty roughly to them, and one of them said something and went on."

Mr. Tucker states that, being thus roused by Mrs. Hatch, he dressed as rapidly as possible, and, upon ascertaining from Mrs. Hatch what had occurred, he took his pistol and went forward for the purpose of finding these men. When asked with regard to the conductor, and as to when he found him, he made the following reply: "It was some time afterwards. I do not know hardly that I could gauge time, under such circumstances, but it was near ten or twelve minutes after

that.   But the impression to me was that he came in the back of the car." The record shows that the sleeping car conductor was in charge of both the Memphis and St. Louis sleepers, and was at the time riding in the latter sleeper.   With regard to the porter, as well as the conductor, the following questions and answers were made by him:

"Q. And do you not know during that time of a porter or conductor being in the car?

"A. No, sir.

"Q. And the porter came into the car after the occurrence?

"A. Yes, sir; that is my impression."

On cross-examination, Mr. Tucker stated that he was quite sure that he did not see the porter until he returned to the sleeping car after having made a search in the car in front for the men who had committed this outrage.   He was then asked by the counsel for the defendants below if it was not possible that the porter may have gone forward and returned to the other car in search of the conductor, while he (Tucker) was making his search, and he says that he does not think such was the case, for the reason that he was sitting on the edge of his berth slipping on his shoes preparatory to the search which he immediately started upon, and he does not think it possible for any one to have passed without his noticing it, and if any one had attempted to pass he would certainly have known it.

This cross-examination to which Mr. Tucker was sub-

jected was in view of the testimony which was subsequently elicited from the porter of the car, who stated that he was in the lady's toilet in the rear of the sleeper cleaning up broken glass at the time, and heard the alarm and rushed out, meeting the lady (meaning Mrs. Hatch) five feet from the door in the aisle, and she said, "Oh, porter, there are two drunken men in the car," and with surprise at the statement he rushed to the front in search of the men; that he did not see any one, and he said to the man in the smoking apartment, "Did you see any men in the car there?" but he added that he thought he saw the back of one of the men as he passed out of the far end of the sleeper; "that the men disappeared about the time Mrs. Hatch spoke to him." The porter further stated that he was absent from the body of the car but two or three minutes; that at the time he left it Mrs. Hatch appeared to be sleeping, and that all the passengers had retired with the exception of the gentleman who was in the smoker; that, if the bell was rung, he did not hear it, as it was situated at the opposite end of the sleeper, separated from him by the swinging doors and the closed doors of the apartment in which he was, for a short space of time, engaged in gathering up the broken fragments of glass which had fallen to the floor.

In addition to the testimony of the porter, who, according to his statement, was engaged from time the train left Texarkana until two or three minutes before this outrage, in a diligent watch of the car, the plain-

tiffs in error introduced as witnesses Mr. Polonius (the gentleman who sat in the smoker), who stated that he saw the two men in question pass the door of the smoker going in the direction of the front of the sleeper, and that his attention was attracted to them by some peculiarity of their dress; that afterward Mr. Tucker came by on his search for them; and that, being advised that something unusual had occurred, fearing Mr. Tucker might get into difficulty and need assistance, he accompanied him. Failing in the search, they returned to the sleeper, and found Mrs. Hatch, and the two then had a conversation with her, in which they undertook to quiet her apprehensions. According to the testimony of Mr. Polonius, the impression made upon him by Mrs. Hatch was that the wrong of which she complained, and which had given her the alarm, was that, in passing, one of these men had stumbled and put his hand into her berth or parted the curtains. In other words, according to his statement, the incident was of trifling importance, with regard to which Mrs. Hatch was unnecessarily alarmed. The jury, however, accepted the testimony of Mrs. Hatch, not only with regard to the outrage, but also as to the protracted absence of the conductor and the porter from the car, and we see no reason on this record why they should not have so done. It follows that there is material evidence supporting the averments of the declaration, both with regard to the extent of the outrage, the conditions under which it was perpetrated, and the absence from the car of those whose duty it was

to exercise care and watchfulness, not only of the property, but also of the persons, of those committed to their custody.

The trial judge in this case gave an admirable charge to the jury. It was clear in its statements, and, without being meager, had the quality of brevity which, added to its clearness, made it what a charge should be, an intelligent guide to the jury in making up their verdict. The only error in the statement of the proposition of law which was made was in favor of the railroad company, in that he stated that with regard to it, as well as the Pullman Company, the rule of law was that only ordinary and reasonable care and diligence in watching over its passengers to protect them from assault and injury was required. This was a sound proposition, so far as the Pullman Company was concerned, but not as to the railroad company. From the latter the law exacts a high degree of care and vigilance as to passengers. While not an insurer, the carrier of passengers has put him under the burden of exercising a high, if not the highest, degree of vigilance to protect his passengers, not only from his own employees, but from fellow passengers and from strangers. So it is that the railway company cannot complain in that the trial judge imposed a lower burden upon it than the law would exact. Nor can the Pullman Company be heard to complain, for whatever error was committed in that respect by the trial judge did not result in injury to it, inasmuch as the proposi-

tion of law announced, so far as it was concerned, was sound.

But the insistence is made for both companies that, as they had no reasonable ground for suspicion that these parties would enter the sleeper.and commit this wrong neither can be charged with negligence or held liable for the injury resulting to Mrs. Hatch from this wrong.

It is true that the rule of law is, as announced in *Ferry Cos.* v. *White,* 99 Tenn., 263, 41 S. W., 583, 585: "If there was nothing on the part of the passengers or otherwise to create in the minds of any reasonable person any apprehension of danger, the defendant cannot be charged with negligence or held liable for injuries resulting therefrom." This principle is supported by many authorities, relied on by plaintiffs in error especially, and is emphasized in the cases of *Connells, Executor,* v. *C. & O. Ry. Co.,* 93 Va., 44, 24 S. E., 467, 32 L. R. A., 792, 57 Am. St. Rep., 786, and *Batton* v. *S. & A. R. R. Co.,* 77 Ala., 591, 54 Am. Rep., 80.

The principle announced by these cases, which is a limitation upon the general rule of liability of the carrier, is altogether sound, but it comes into play as a matter of necessity, only when the carrier is diligent in discharge of his general duty to his passengers; in other words, is not guilty of negligence. It was not in the mind of any court announcing this principle that where the carrier was guilty of abandoning his post, where only he could discharge this duty, that the law

would come into excuse him from liability for an injury resulting from such negligence, because he had neither known at the time or anticipated that the wrong would be perpetrated. It would hardly be contended that, where an outrage was inflicted by either a fellow passenger or a stranger upon one traveling upon a railroad train, who was entitled by his passenger relation to vigilant care upon the part of the carrier, the carrier would be absolved from liability for this wrong, because it neither knew nor reasonably anticipated it, when it appeared that the employees in charge of the train were gathered in the baggage car, or in some other remote part of the train, where they had been for hours before the outrage occurred and at the time of its occurrence. The very fact that they were so gathered was negligence upon their part, which contributed to the injury, and in such case the rule announced in the *Ferry Co.'s Case,* and the other cases referred to, would have no application. No more could it be applied in the present case, as it was made out by the plaintiff below and accepted by the jury, where the conductor disappeared immediately after taking up the transportation of Mrs. Hatch, as did also the porter, absenting themselves from the car in which she was riding during the interval of time which elapsed between leaving Texarkana and twelve o'clock at night. There was, in this absenting themselves from the sleeper for this period of time, and failing to answer the numerous bells that were rung, neither the vigilant care exacted of the railroad

company, nor the reasonable care required of the Pullman Company.

But it is said on the part of the Pullman Company, that the trial judge was in error in declining to give certain special requests that were submitted by its counsel. These requests embraced the theory of that company upon certain proven facts with the propositions of law which it sought to have applied to that theory. Granting that they were entirely sound, yet we think that the trial judge cannot be put in error for declining to give these, inasmuch as he did not undertake to state the theory of either party to the lawsuit, but laid down, in general terms, and with unusual clearness, sound propositions of law which would guide the jury in reaching a correct solution of the case, as they might adopt the theory of facts of the plaintiffs or of the defendants.

So far as the more important assignments of error submitted for the railroad company are concerned, we do not think on this record that they are well taken. The matter of complaint embraced in these two assignments were not called to the attention of the trial judge, in the motion for a new trial, as was required by a rule of that court, and therefore cannot be considered here. Even, however, if it was otherwise, in view of the charge given, there is nothing of which it can complain.

Judgment affirmed.