MARGARET WELCH ET AL., Respondents, *v.* DANIEL W. MCALLISTER, Appellant.

May 13, 1884.

1. DAMAGES — NEGLIGENCE — QUASI PUBLIC PLACE. — The occupier of a business house into which the public or the plaintiff is invited by the occupant to trade with him for their mutual benefit, is bound to keep the premises in a reasonably safe condition.

2. —— EVIDENCE — INSTRUCTIONS. — Circumstantial evidence of permanent injury may warrant an instruction for damages on that theory, though the character of the injury and the extent to which it incapacitates the plaintiff to earn money, be not well defined.

3. —— NEW TRIAL — EXCESSIVE DAMAGES. — A new trial will not be granted on the ground that excessive damages have been awarded for a personal injury, unless the amount awarded shows passion or prejudice and a disregard of the evidence on the part of the jury.

APPEAL from the St. Louis Circuit Court, THAYER, J. *Affirmed.*

JAY L. TORREY, for the appellant: The plaintiff was a mere volunteer on the defendant's premises. — *Murray* v. *McLean,* 57 Ill. 378; *Zoebisch* v. *Tarbell,* 10 Allen, 385. There was no evidence of permanent injury to support the instructions given. — *Steinecke* v. *Marx,* 10 Mo. App. 581; *Krech* v. *Pacific Railroad Co.,* 64 Mo. 172; *Clark* v. *St. Louis, etc., Railroad Co.,* 64 Mo. 440; *Lillis* v. *St. Louis, etc., Railroad Co.,* 64 Mo. 464; *Huffman* v. *Ackley,* 34 Mo. 277; *Gist* v. *Craig,* 60 Mo. 487; *Harrison* v. *Cachelin,* 27 Mo. 26; *Bradford* v. *Pearson,* 12 Mo. 71; *Cobb* v. *Fogalman,* 1 Ired. L. 440. There was no evidence of the reduction of the earning capacity of the plaintiff, or the extent to which her powers were impaired by the injury. — *Wade* v. *Leroy,* 20 How. 34; *Ballou* v. *Farnham,* 11 Allen, 73. Where the plaintiff does not show by his evidence the amount of his damage he is entitled to nominal damage only. — *Smith* v. *Houston,* 25 Ark. 183; *DeBriar* v. *Minturn,* 1 Cal. 450; *Oakley Mills Mfg. Co.*

v. *Neese*, 54 Ga. 459; *Cochrane* v. *Suttle*, 75 Ill. 361; *Pittsburg, etc., Railroad Co.* v. *Dewin*, 86 Ill. 296. A verdict for exemplary damages, in a case calling for compensatory damages only, will not be allowed to stand. — *City of Chicago* v. *Kelly*, 69 Ill. 475; *City of Chicago* v. *Langlass*, 52 Ill. 256; *Goodno* v. *Oshkosh*, 28 Wis. 304; *Nashville, etc., Railroad Co.* v. *Smith*, 6 Heisk. 174; 2 Thomp. Neg., p. 1269, sect. 65.

SMITH P. GALT, for the respondents.

THOMPSON, J., delivered the opinion of the court.

This cause was before the court at a former term (13 Mo. App. 89), and we reversed the judgment of the circuit court on the ground that the jury had awarded nominal damages only, whereas the evidence showed that a very substantial injury had been suffered. On the trial in the circuit court, from which this appeal has been taken, the plaintiff had a verdict and judgment for $500. We are asked to reverse this judgment on the ground that the court erred: 1. In refusing an instruction for a non-suit at the close of the plaintiff's case. 2. In submitting the question of permanent injury to the jury. 3. In refusing to grant a new trial on the ground of excessive damages.

I. On the first point, it seems to us that the plaintiff submitted substantial evidence sufficient to take her case to the jury. Her husband and co-plaintiff, John Welch, testified as follows: " On the 22d of March, 1881, my wife and I went into the defendant's pork house at Nos. 9 and 11 South Eleventh Street, in the city, to buy a smoked shoulder. We had been buying meat there for two years, about once a month. When we went in the defendant's foreman, Stephenson, was sitting near the door. W.e had bought meat from him a number of times before. I told him we wanted a smoked shoulder. He said they were out of smoked shoulders, but they had some green ones. There was a big lot of fresh ones on the north side of the room,

back. He said they had some salted ones, and they would keep, and he said he would show them to us, pointing to a lot of meat back on the south side of the room. It is a very large room. We started back, I ahead, and he about six feet behind me, and about eight feet behind him came my wife. He was showing me the salted shoulders, when all at once I heard a shriek. I looked around, and my old woman was falling down the hatchway. She seemed to step right off into it. I jumped towards her and looked down, and she was lying all in a heap on the bottom of the cellar. The hatchway was about five feet square. It was open. There was no guard or protection to it at all. It was behind and a little ahead of us. I did not see it myself at all until I saw my old woman fall into it. I didn't know it was there. Never was back in that portion of the store before. It was not light there."

On cross-examination he said : " He went to look at green shoulders ; that the building was fifty feet wide, fronting on the west side of Eleventh Street, by a depth of one hundred feet ; that the building was lighted by an eight by twelve feet door and two windows in front, and by a six by twelve feet door and seven windows on the south side of the building ; that the door and windows on the south side opened on to an alley ; that there was a shed on the north side of the building, so that very little, if any, light came from that side ; that the hatchway was about midway of the building, and immediately in front of a window ; that the hatchway was extended down to the cellar and up to the third story ; that it was open up as well as down, and that opposite each opening was a window ; that he did not know whether or not the hatchway was the lightest part of the building ; that he did not request his wife to come into the building, and did not know that she was coming back in the building until he heard her make a noise just before he saw her fall into the hatch ; that the accident occurred on a

bright, light day, between 12 and 1 o'clock; that he did not see a large board sign on which was written 'No admittance behind this board.' "

The plaintiff, Mrs. Welch, testified: " That on the day of the accident she walked into defendant's store and fell through the floor. My husband and I went there to buy some meat, as we had been doing for several years. He asked the foreman for a smoked shoulder, and he said they had none, but talked about salted shoulders, and said he would show them to us. Then we all started back. I never was back there before. I was behind. When I was near these shoulders, all at once I stepped right off into this hole. I shrieked, and then I did not know any more until I was on the street. There was no guard or protection about this hole at all. I did not see it until I fell into it. It was dark there. We had bought meat from this same foreman at that store before."

On cross-examination she said : " That she did not know that the hatchway was the lightest part in defendant's pork house, as she could not see back in there, as it was dark; that she was not invited, requested, or commanded to go into the defendant's pork house on the day of the accident by her husband, defendant's foreman, or any other person ; that she did not see any window right in front of the hatchway, or any window in the second story, or any window in the third story, through which the light was shining brightly ; that her feet slipped forward from the south side of the hatchway towards it, and that she fell backwards ; that she did not see a large board sign on which was printed plainly and in large letters 'No admittance behind this board ;' that she could not say whether or not such a sign was there * * * that the accident occurred at noon on a bright day ; that she could not say that there were seven windows and a large door standing open on the side of the building where she fell into the hatchway or not, as it was dark to her back in there."

The general rule that an owner, or occupier of enclosed premises owes no duty to trespassers, volunteers, or bare licensees, to keep them in a safe condition so as to prevent injury to persons thus coming upon them, is conceded. This rule has, however, no application in respect of injuries which happen in consequence of dangerous places being left in business houses, into which the public are impliedly invited by the proprietor or tenant to trade or do business with him. This question was very thoroughly considered in the English Common Pleas in 1866, in a case which has been since regarded as a leading case upon the subject. In giving the unanimous judgment of the court, Mr. Justice Willes laid down the rule upon the subject as follows: " The authorities respecting guests and other bare licensees, and those respecting servants and others who consent to incur a risk, being therefore inapplicable, we are to consider what is the law as to the duty of the occupier of a building with reference to persons resorting thereto in the course of business, upon his invitation, express or implied. The common case is that of a customer in a shop ; but it is obvious that this is only one of a class ; for, whether the customer is actually chaffering at the time, or actually buys or not, he is according to an undoubted course of authority and practice, entitled to the exercise of reasonable care by the occupier to prevent damage from unusual danger, of which the occupier knows, or ought to know — such as a trap door left open, unfenced, and unlighted. *Lancaster Canal Co.* v. *Parnaby*, 11 Ad. & E. 223 ; 3 Per. & Dav. 162; *Chapman* v. *Rothwell*, El. Bl. & El. 168 ; 27 L. J. ( Q. B.) 315 ; *Southcote* v. *Stanley*, 1 Hurl. & N. 247 ; 25 L. J. (Exch.) 339. This protection does not depend upon the fact of a contract being entered into in the way of the shopkeeper's business during the stay of the customer, but upon the fact that the customer has come into the shop in pursuance of a tacit invitation given by the shopkeeper, with a view to business which concerns himself. And if a customer

were, after buying goods, to go back to the shop in order to complain of the quality, or that the change was not right, he would be just as much there upon business which concerned the shopkeeper, and as much entitled to protection during this accessory visit, though it might not be for the shopkeeper's benefit, as during the principal visit, which was. And if, instead of going himself, the customer were to send his servant, the servant would be entitled to the same consideration as the master. The class to which the customer belongs includes persons who go, not as mere volunteers, or licensees, or guests, or servants, or persons whose employment is such that danger may be considered as bargained for, but who go upon business which concerns the occupier, and upon his invitation, express or implied. And, with respect to such a visitor at least, we consider it the settled law that he, using reasonable care on his part for his own safety, is entitled to expect that the occupier shall, on his part, use reasonable care to prevent damage from unusual danger which he knows, or ought to know ; and that, where there is evidence of neglect, the question whether such reasonable care has been taken, by notice, lighting, guarding, or otherwise, and whether there was contributory negligence in the sufferer, must be determined by a jury as matter of fact." *Indermaur v. Dames*, L. R. 1 C. P. 274.

This judgment was unanimously affirmed in the court of Exchequer Chamber ; and in the opinion of this court, given by Chief Baron Kelly, the views thus expressed by Mr. Justice Willes were quoted and approved. L. R. 2 C. P. 311. The American courts have stated and applied the rule in the same way. Thus, in a case in Massachusetts, it was said by Mr. Justice Gray, with his usual clearness and accuracy : " The owner or occupier of land is liable in damages to those coming to it, using due care, at his invitation or inducement, express or implied, on any business to be transacted or permitted by him, for an injury occa-

sioned by the unsafe condition of the land, or of the access to it, which is known to him and not to them, and which he has negligently suffered to exist, and has given them no notice of." *Carleton* v. *Franconia Iron Co.*, 99 Mass. 216. The following cases will serve to show the manner in which this rule has been applied : The servant of a lumber dealer piled lumber in his yard so negligently that the wheel of a customer's wagon struck it, in consequence of one of the accidents of travel, causing it to fall on the plaintiff, a third person, while lawfully on the premises. *Pastene* v. *Adams*, 49 Cal. 87. A policeman went into a business house at night, through an upper window, to search for burglars, whom he suspected to be at work there. He fell through a hoistway left open in violation of a city ordinance. *Ryan* v. *Thomson*, 2 Jones & Sp. 131. The owner of a private bonded warehouse, existing under the act of Congress of March 28, 1854, left a hatchway open and unguarded. An officer of the customs, on a tour of duty in such warehouse, fell through this hatchway and was killed. *Luddington* v. *Miller*, 4 Jones & Sp. 1. A licensed waterman, having complained to a person in charge of the defendant's business, that the defendant's barge was being navigated unlawfully, was referred to the defendant's foreman. While going along the defendant's premises, in search of his foreman, he was injured by the falling of a bale of goods, so placed as to be dangerous, and yet to give no warning of the danger. *White* v. *France*, 2 C. P. Div. 308 ; *s. c.* 5 Cent. L. J. 281. There was a passageway leading from a public street to the office of a brewery, which was the regular means by which customers of the brewer passed to and fro. A customer, who had visited the office on business and was returning to the street, fell into a trap door in the passage-way, which the brewer or his servants had wrongfully left open, unguarded and unlighted. *Chapman* v. *Rothwell*, El. Bl. & El. 168. The upper floors of a building were leased to a tenant, the pro-

prietor using the lower floors. In the passage-way, by which the tenant gained access to his part of the building, there was a hatchway, which the landlord used in the day-time, but closed at six o'clock p. m. Between eight and nine o'clock p. m., the tenant entered the building without a light, fell into the hatchway, and was killed. *Totten* v. *Phipps*, 52 N. Y. 354. In each of these cases it was held, either that there was a good case on the pleadings against the proprietor of the premises, or, on the facts, a case to go to the jury.

Applying the doctrine of these cases to the case made by the plaintiff's evidence in the case before us, it will appear that, if the jury believed this evidence, they were authorized to find that husband and wife, two old persons, had gone to this pork house to buy a smoked shoulder; that they had frequently bought meat there before, and of the foreman who was then in charge of the place; that the husband inquired for a particular kind of meat, and was told by the foreman that they did not have that kind of meat, but that they had a different kind of meat, which he recommended, and which he would show to them, pointing to a lot of meat in a distant part of the room; that they started back to look at this meat, the husband in advance, the foreman of the house following, and the wife following in the rear; that no warning was given them of any open and unguarded hatchway in the direction in which they were walking; that no warning or sign of "No Admittance" was seen or heard by either of them; that that part of the room was dark; that the wife walked into the hatchway, and, falling, received the injuries complained of. It may be added that, in the defendant's evidence, the case thus made by the plaintiff's evidence was assisted by the testimony of this foreman, that "the floor was slippery from the grease." We think the case thus made comes within the rule of the cases above cited. Neither the husband nor

the wife is to be regarded as having been a trespasser, a mere volunteer, or a bare licensee, in the portion of the building where the open hatchway was situated.   It is true that Mrs. Welch testified, on her cross-examination, as above quoted, that she " was not invited, requested, or commanded to go into this pork house on the day of the accident, by her husband, defendant's foreman, or any other person." It, nevertheless, appeared that the defendant had been in the habit of selling meats at retail to the plaintiffs at this very place, and the suggestion of the foreman made to Mr. Welch, at the same time pointing toward that portion of the large room where the accident happened, that they had green salted shoulders there, which he would show to them, were facts from which the jury might well infer an implied license on the part of Mr. and Mrs. Welch to go to that part of the store upon a business beneficial both to them and to the defendant.   This being so, the absence of any warning of the open and unguarded hatchway was a circumstance which would authorize the jury to infer negligence on the part of the defendant; and we see no fact arising out of the plaintiff's evidence from which the jury were obliged to infer that the  accident happened in consequence of the contributory negligence of Mrs. Welch.   Certainly, a jury is not bound to infer that, for an old lady, nearly seventy years of age, to fall into an open and unguarded hatchway upon a greasy floor in a dark room, the existence of which was unknown to her, is negligence.

II. Nor do we think that the court erred in submitting the question of permanent injury to the jury.   It is true that the evidence upon this point was meager, in that it did not define the nature and character of the permanent injury which Mrs. Welch had sustained, or show to what extent it would reduce her capacity to earn wages.   It consisted solely of the following statements of witnesses: —

Dr. Beckendorf said : " A concussion which would pro-

duce such wounds might, by the shock to the nervous system, permanently affect the health of a woman of her age."

John Welch said : " Before she was hurt she had always been in perfect health.  She was as strong and active a woman for her years as there was in St. Louis.  Now there is nothing left of her."

Mrs. Welch, the injured plaintiff, said : " That she was badly hurt and had not been her self since."

When it is recollected that this accident took place more than two years before the trial, it can not be said, in the light of these statements, that there was not some substantial evidence of permanent injury which the jury were authorized to take into consideration; and the instruction complained of merely said to the jury, " if you believe that she sustained any permanent physical injury in consequence of the fall, you may make a reasonable allowance on that account."

III. It is quite clear that the court did not err in refusing a new trial on the ground of excessive damages. Damages, it must be remembered, in cases of personal injuries, are given for physical suffering, as well as for an actual loss of time and of earning capacity, and an actual expenditure of money, surgeon's bills, and the like.  An examination of the precedents in such cases would, we are sure, show many cases where verdicts as large as this have been sustained, where the injury appeared to have been no greater than this.  It must be remembered that the law has committed the estimation of damages in these cases, — where, from the nature of the case, the amount of damages which are to be awarded is largely a matter of individual opinion, — to juries, and not to judges ; and that the court, in general, has no power to oppose its judgment to that of the jury upon this question, except where the award made by the jury is either so great or so little as the indicate that the jury have proceeded in a clear disregard of the evidence,

and have rendered a verdict which is the result of passion or prejudice. It is very clear that this can not be predicated of the verdict in this case, which, in respect of the extent of the injury, was supported by the following evidence offered by the plaintiff, in addition to that already quoted touching the permanency of the injuries received : —

Plaintiff John Welch said : " She laid in bed at home for two weeks ; then she got out of her mind, and sent her to St. Mary's infirmary. I visited her there every day. She was out of her mind most of the time. She was there three weeks."

Mrs. Welch said that " she had four cuts on her head ; * * * that her wounds were dressed at the City Dispensary, by her doctor, and at St. Mary's infirmary ; that she had no one at home to help her or care for her, except her husband ; that while suffering from this accident Mrs. Laughlin had helped her ; that she had gone to the infirmary, two or three days after being hurt, and remained about two weeks ; that they had shaved her head and put poultices on it ; that she was seventy years old."

Mrs. Laughlin said that " she waited on Mrs. Welch for a day or two after she was hurt ; that the wounds bled to an alarming extent ; that she called on her after she went to the infirmary, and found her with her head shaved and face swollen ; that she was badly hurt and had a severe time of it."

Dr. Beckendorf said : " That, on the same day of the accident to Mrs. Welch, he was called to see her ; that there were two wounds on her head from which the hemorrhage was fearful ; that he had stopped hemorrhage by bandaging her head and applying great pressure thereby to the head ; that he was called in again that day or the next day ; hemorrhage had broken out again and her face and head very swollen, and thereafter she was sent to St. Mary's infirmary."

This case was tried by a special jury drawn from the

business community; and, on this account, we ought, perhaps, to be more reluctant to oppose our judgment to theirs upon the question of the amount of damages.

The case seems to have been carefully tried in all respects. The instructions were carefully drawn, with the manifest purpose of bringing to the attention of the jury, in a few brief sentences, the relative rights of the parties. The appellant makes no complaint of them.

Upon the whole, we are clear that the judgment ought to be affirmed. It is so ordered. All the judges concur.