Hattie B. Burnison, Respondent, v. Harley H. Souders et al., Appellants.—35 S. W. (2d) 619.

Kansas City Court of Appeals. February 16, 1931.

*Pierson P. Carpenter, Burns & White* for respondents.

*Sparrow & Patterson, Gardner Smith* and *Edward J. Tangney* for appellants.

BLAND, J.—This is an action for damages for personal injuries. Plaintiff recovered a verdict and judgment in the sum of $2500·and defendants have appealed.

The facts show that plaintiff was injured on August 14, 1927, by falling down a stairway in a hotel, where she was living as a guest, located in Kansas City. At the time in question, and at all of the times hereinafter mentioned, defendants were lessees of the hotel and were in the operation of the same. A son of one of the defendants was in charge of the hotel as manager thereof.

Plaintiff became a guest of the hotel about nine months prior to the receipt of her injury. The hotel contained sixty-six rooms and had on an average of about seventy-five guests. Plaintiff's room was located upon the second floor of the hotel about sixteen or seventeen feet northwest of the top of the stairway in question. There was a small lobby at the top of the steps which had two large doors with glass panels in them opening upon a front porch. The stairway well was square in shape and in going down the stairs were winding. The first five steps went down toward the south, the stairs then turned toward the west where the east and south wall of the stairway well came together at right angles. The turn consisted of four steps. There was then seven steps going down toward the west when the stairs curved toward the north. There were four steps in this second curve. Thereafter the stairway straightened out with four more steps going toward the north into the lobby on the first floor. There was a number of windows in the first floor lobby.

The steps were made of black walnut lumber. They had a banister on one side and ran to the wall on the other. The risers of the steps were seven and one-eighth inches. The stairway proper was from three to four feet in width. The sixth step from the top, being the one upon which plaintiff fell and the first step of the first turn in the stairway going down, was fifty-three and three-fourths inches in length or longer than the preceding steps. On account of this step constituting the first one in the turn the step toward the banister or the inside of the stairway was narrower than it was where it joined the wall on the outside. The narrower end was

seven and one-eighth inches in width and the outer end, or the one next to the wall, twenty-three inches in width. On account of this difference in the width of the step in question there was a triangular board placed back of the main board of the step with its greatest width next to the wall, and running toward the banister the board ended in a point. This board was narrower and smaller than the other board in the step. The evidence shows that the front board was from a fourth to a half inch higher than the rear board.

There was a carpet twenty-six and one-half inches in width running down the center of the steps for their entire distance. Upon each step was placed a rubber mat nine inches wide from front to back. However, the mat lacked three inches of covering the carpet on the left hand or outer side of the stairway in descending. The mat and carpet were fastened on each step in front and rear but not upon the sides. Plaintiff testified that on account of the sides of the carpet and mat being loose the edge of the carpet toward the wall upon the sixth step did not lay down flat but extended above the step a "half to three-quarters inches, possibly an inch."

The accident happened about 5:30 in the evening of a clear day. Plaintiff and a Mr. Young were intending to leave the hotel to go to a theater. They left her room, crossed the second floor hall or lobby in a diagonal direction and started to descend the stairs. Mr. Young had hold of plaintiff's arm and was on her right side or next to the banister and she was on his left or inside next to the wall. What happened can be best described in plaintiff's own words:

"Well, when we started to make the curve I got on that step (the sixth) and stepped my right foot down and the back board gave down and caught my heel, and at the same time just the edge of my toe caught alongside of the carpet and when I went to lift my foot to step on the next step it threw me headlong."

Plaintiff testified that the back board of the step gave down from a quarter to half an inch; that she fell headlong for a distance of eight steps, skinning her knee and arm and striking her head against the wall; that the cap of her heel was torn off and the leather upon the heel of her shoe was torn loose. She testified that her heel was of medium height; that the step "creaked" at the time; that it had creaked previously when she had walked upon it; that she "never paid any particular attention to it;" that several of the steps had creaked before when she walked upon them.

On the question of visibility, one of plaintiff's daughters testified that from the first to the third step starting from both the top and the bottom of the stairs the light was good "but in the middle of the steps you could not see at all;" that it was impossible to see the crack between the two boards without getting down and lighting a match. Plaintiff testified that during the time she had lived at the hotel she had passed up and down the stairs in question at least

twice daily; that she was always careful and "always observed the steps" as she used them; that she knew of the carpet and rubber mat upon the steps; that they could be seen without trouble, "you could always see the carpet;" that at the time she fell whatever was there in the way of a carpet or matting "was in perfectly plain sight and view;" that she did not know the color of the carpet but the matting was "black, gray or dark" and that anyone using the steps "could see what part of the steps was covered with matting and what part was covered with carpet." However, she testified that "you could not see any unusual condition unless you got down and examined it." She was then asked whether the step in question had been in the same condition "during the entire time you had used it." She answered, "Well, as far as I know."

Plaintiff's daughter, Bonnie Burnison, testified that during the first part of July previous to her mother's fall, in going down the stairs the witness stepped on the rear board of the sixth step, breaking the heel off her shoe. There was evidence that the porter and the manager of the hotel were in the office of the hotel at that time; that they came up and asked what had happened and were told, according to another daughter of plaintiff, that "my sister had caught her heel in the step and thrown her and the baby and they both came down the steps, and they both came up to where the step was." "Q. Did they look at it? A. Yes, sir." The daughter who fell further testified that plaintiff was not at home at the time; that when she (plaintiff) returned she related to her mother the circumstances of the fall and told her that she fell "on the first turn" which was the sixth step.

The evidence shows that beginning with the first part of July, 1927, if not before, "the mats were tacked down in front, but on the sides the rug is loose on the steps and when you step, your weight makes the board, the back board, go down anywhere from one-eighth to a quarter of an inch." Plaintiff testified that for a month prior to her fall she had knowledge that the step was made of two boards; that she knew there was "a seam there" and that she meant by seam where the two boards forming the step came together.

The testimony shows that the condition of the stairway was unchanged during the time of plaintiff's residence at the hotel and prior to her injury. The evidence also shows that while there was a rear stairway, the stairway in question was the only one provided for the general use of guests of the hotel.

Defendants insist that their instruction in the nature of a demurrer to the evidence should have been given. There is no merit in this contention. In arguing this point defendants rely for the most part upon two facts or circumstances that were decided against them by the jury upon conflicting testimony. These claimed cir-

cumstances are (1st): ·That no one other than plaintiff had fallen upon the step prior to her fall: (2nd) That the place where plaintiff fell was well lighted. In connection with the point that their demurrer to the evidence should have been sustained, in addition to these claimed circumstances, defendants point out that plaintiff knew of the defect causing her fall but, in claiming that her knowledge defeats her recovery, rely upon a misconception of the law relative to the relationship existing between an innkeeper and his guest. Defendants insist, without citing a single innkeeper case, that the relationship between plaintiff and defendants was the same as that existing between the owner of lands and those coming thereon at his invitation or inducement on business. Where one is a pure invitee, such as where he comes upon the premises of the owner or occupier of land at the latter's invitation on business to be transacted with or permitted by him thereon, if the invitee is injured by the unsafe condition of the premises, which the owner or occupier has suffered to exist, but of which the invitee has notice, then the latter is not entitled to recover. In other words, it is held, that where the owner or occupier of premises has no superior knowledge of the condition of the premises, there is no liability. [Maine v. Lehman, 294 Mo. 579; Mullen v. Sensenbrenner Merc. Co., 260 S. W. 982; Voght v. Wurmb, 300 S. W. 278; Goetz v. Hydraulic Press Brick Co., 9 S. W. (2d) 606; Clash v. Sonken-Galamba Co., 17 S. W. (2d) 927, 929, 930; 20 R. C. L. pp. 56, 57, par 52.]

It is true that an innkeeper holds out to members of the public an implied invitation to come on to his premises as guests. In that sense when one becomes his guest he is on the innkeeper's premises at the latter's invitation and is an invitee. This much may be conceded. However, it does not follow that the relationship between them is not something more than that claimed by the defendants. When a city opens up a street for use by the public there is an implied invitation to the public to use it, a carrier impliedly invites the public to use its cars and a merchant impliedly invites the public to his premises to transact business with him. But in each of these instances the law governing the situation is different.

In Voght v. Wurmb, supra, l. c. 279, (a pure invitee case) the Supreme Court said:

"*On the facts of this case we have to consider, not the duty which a carrier owes to a passenegr, or an employer to an employee, or a municipality to the traveler on its thoroughfares, but that which the owner or occupier of land owes to his invitee.* With respect to this latter duty and the liability growing out of its breach, the well-settled rule is this: The owner of lands is liable in damages to those coming thereon, using due care, at his invitation or inducement, express or implied, on any business to be transacted with or permitted by him, for an injury occasioned by the unsafe condition

of the premises, which is known to him and not to them, and which he has suffered negligently to exist, and of which they have received no notice. [Maine v. Lehman, 294 Mo. 579, 243 S. W. 91; Mullen v. Sensenbrenner Merc. Co. (Mo. Sup.), 260 S. W. 982, 33 A. L. R. 176; Welch v. McAllister, 15 Mo. App. 492; Donaldson v. Wilson, 60 Mich. 86, 26 N. W. 842, 1 Am. St. Rep. 487; Calvert v. Springfield Light Co., 231 Ill. 290, 83 N. E. 184, 14 L. R. A. (N. S.) 182, 12 Ann. Cas. 423; Bennett v. Railroad, 102 U. S. 577, 26 L. Ed. 235; 20 R. C. L. 56, par. 52."] (Italics ours.)

To paraphrase the language of the Supreme Court in the Voght case, on the facts of this case we have to consider, not the duty which a proprietor, owner or occupier of real estate (such as a merchant) owes to those coming thereon at his invitation on business to be transacted or permitted by him, or in other words the duty of a proprietor to a pure invitee, but that which an innkeeper owes his guest. There is quite a difference between the situation existing between a merchant and his customer and an innkeeper and his guest. In the former case the invitee comes upon and uses the merchant's premises for a purpose mutually advantageous to each and no consideration is paid by the invitee for the use of the premises as in an innkeeper's case. When one goes to a hotel the very thing he bargains for is the use of safe premises. While the landlord is not an insurer, under such circumstances, the law protects the guest from the carelessness of his landlord even where the defect in the premises is known, or is obvious to the guest so long as the guest ues ordinary care.

"The requirement of reasonable care for the safety of the guests extends to the buildings and appliances of the inn, which both in construction and maintenance must be such as reasonably to secure the safety of the guest. For any injury to the guest caused by lack of due care in this respect the innkeeper is liable. If, *however, the defect is an obvious one, the guest must use reasonable care on his own part; and if he is himself negligent, he cannot recover from the innkeeper.*" [22 Cyc. 1081.] (Italics ours.)

The difference between the innkeeper cases and those relied upon by the defendant is this: In the case of an innkeeper, if the defect is known or is an obvious one, then it is a question of contributory negligence on the part of the guest, whereas, in the cases relied upon by the defendants, if the defect is known or is an obvious one, the proprietor is not liable, regardless of whether or not the invitee is negligent. In other words, if the proprietor has no superior knowledge of the defect but the same is known or is obvious to the invitee, then the proprietor owes the invitee no duty in reference to the matter.

As to the question of the presence of adequate light, it is contended by defendants that plaintiff admitted that it was a bright day and

that the defect was in plain view. We find the following question and answer in the record in connection with plaintiff's testimony:

"Well, whatever was there was in perfectly plain sight and view, wasn't it? A. Yes, sir, you could see it."

But from a reading of her testimony, before and after that quoted, it is plain to be seen that what plaintiff was referring to was the presence of the matting and carpet when she said: "Whatever was there was in perfectly plain sight and view." Relative to the color of the matting and carpet she stated that she did "not know about the color" of the carpet at this particular point, but that the matting "was a black, gray or dark." She testified that she could see what part of the step was covered with matting and what part with carpet. As to the matter of the presence of a defect in the step she testified: "You could not see any unusual condition unless you got down and examined it." There was other and ample evidence in the record tending to show that the defect could not have been seen without lighting a match or without the aid of some other artificial light.

It is not true, as contended by defendants, that no other person testified to this incident is unworthy of belief because there was daughter fell at the same place about six weeks prior to plaintiff's fall. Defendants claim that the evidence of the two daughters who testified to this incident is unworthy of belief because there was evidence on the part of thirteen witnesses for defendants, who were or had been guests of the hotel, that they had no experience with the board springing when they used the stairs. Of course, this conflict, if any, in the testimony was for the jury.

It was for the jury to say whether the defect in the case at bar was of sufficient moment to constitute negligence on the part of the defendants in maintaining it. The evidence shows that the front board on the sixth step extended above the rear board from a fourth to a half inch; that the carpet upon the step was fastened in the front and the rear but not upon the sides and on account of the carpet and mat being loose at the edge of the carpet toward the wall, the carpet did not lay down flat but extended above the step from a half to three-quarters of an inch; that when the rear board was stepped upon it would spring downward from an eighth to a half of an inch, permitting the toe of a shoe to get caught under the edge of the carpet; that the place was so dark that the defect could not have been seen without the aid of a lighted match or other artificial light. The evidence further shows that this was the only stairway for general use by the guests. In other words they were required to use these stairs in ascending and descending to or from the upper floors. Another person had fallen in a similar manner a short time prior to plaintiff's fall, which prior fall was known to defendants' agent. Under the circumstances, it can hardly be questioned but

that it was for the jury to say whether the defendants were in the exercise of ordinary care in maintaining the steps in the condition shown. [Nephler v. Woodward, 200 Mo. 179, 188.]

It is claimed that defendants' demurrer to the evidence should have been sustained becaused plaintiff was guilty of contributory negligence as a matter of law. In this connection defendants make a calculation as to the number of times, running into the thousands, that guests had used the stairway without injury, all of which is based upon defendants' evidence. It also is pointed out by defendants that plaintiff used the stairway at least twice daily during the nine months that she lived at the hotel, prior to her fall, and that she "knew everything that it was possible anyone could know about its condition," and was, therefore, guilty of contributory negligence in "planting her foot directly over the crack" of the step of which she makes complaint. In discussing this point defendants assume that each time plaintiff used the stairway she placed her foot in such a way that it "gave a quarter to half an inch" and that each time she went up and down the stairs the light was so good that she could have seen the crack. We have disposed of the question of light. Of course, it by no means follows that because plaintiff went up and down the stairs at least twice a day for nine months that she stepped upon the sixth step in such a way that the rear board sprung with her. It may be fairly assumed that when a person was going up and down the stairs alone ordinarily he or she would be walking in the center or upon the carpet and mats. The board that gave down ran to a point which was located between the inner edge of the carpet and the banister. There is no evidence conclusively establishing that this board at its center would spring in the way that it did upon the side. In fact there is no evidence upon this point and the burden was upon defendants to establish contributory negligence. It will be remembered that plaintiff was walking down the stairs, having hold of the arm of a gentlemen, who happened to be upon her right upon this occasion, which threw her toward the outer edge of the stairs or toward the wall and off of the carpet and mat.

The evidence relative to plaintiff's knowledge of the situation is that the steps creaked when stepped upon, but the creaking was not confined to the sixth step but other of the steps creaked; that plaintiff found out at a time not "very long" prior to her falling that the step was made of two pieces. Just when she found this out is not clearly shown but it may be assumed that it was when her daughter told her of the latter's fall six weeks prior to the time plaintiff fell. Of course, plaintiff knew, by reason of the information given by her daughter, that the step would give down and cause one to fall. However, the fact that she knew of the defect does not convict her of contributory negligence, as a matter of law. As far as that question is concerned she could use the stairs, provided she ex-

ercised that care which a reasonably prudent person would exercise under like or similar circumstances, and it was for the jury to say, in this case, whether such care was exercised. [Kroeker v. Stecken, 31 S. W. (2d) 229, 230; Wyckoff v. City of Cameron, 9 S. W. (2d) 872; Stretch v. City of Lancaster, 206 S. W. 388; Beauvais v. City of St. Louis, 169 Mo. 500; Taylor v. City of Springfield, 61 Mo. App. 263; Morris v. Railroad, 184 Mo. App. 106; Stephens v. Eldorado Springs, 185 Mo. App. 464; Costello v. Kansas City, 209 Mo. App. 155; McIlhenny v. Kansas City, 188 Mo. App. 218; Lueking v. Sedalia, 180 Mo. App. 203; Patrick v. Springs, 154 N. C. 270; Trulock v. Willey, 187 Fed. 956.]

We have examined the case of Mullen v. Sensenbrenner Merc. Co., supra, cited by defendants. In that case the evidence shows that plaintiff walked over the place where she fell a few minutes before and that the defect was in plain sight and could have been seen by her when she fell and she failed to look where she was going. We fail to see any similarity between that and other cases cited by defendants, and the case at bar.

It is insisted that the court erred in giving plaintiff's instruction No. I, which reads as follows:

"The court instructs the jury that if they find and believe from the evidence that at the time mentioned in evidence the defendants operated the Avilon Hotel, and you further find that at such time plaintiff was a resident guest of said hotel, if so, and you further find from the evidence that the defendants maintained the stairway mentioned in evidence, if so, for the use of guests in the hotel, if so, and that said stairway was partially covered by a carpet, if so, and that the defendants negligently allowed or permitted the boards comprising the sixth step from the top of the stairway mentioned in evidence to be uneven and insufficiently supported so that when persons stepped on such step the board or boards therein would spring and give down, thereby causing an uneven surface on such step, if so, and you further find from the evidence that the defendants negligently allowed or permitted the carpet on such step to be and become loose along the edge thereof, if so, and you further find that because of such condition said step was not reasonably safe for persons to use, if so, and you further find from the evidence that the defendants knew of such condition of said step and carpet thereon or by the exercise of ordinary care could have known thereof, if you so find, in time, by the exercise of ordinary care to have remedied said step and said carpet and made same reasonably safe for persons to use, if so, and you further find from the evidence that the plaintiff while using such step and while in the exercise of ordinary care for her own safety, if so, was caused to catch her foot on said step and carpet because of the aforesaid condition of said step and carpet, if you so find, and thereby caused to fall and injure herself,

if so, then your verdict must be for the plaintiff and against the defendants.

" 'Negligently' as used in this instruction, means the failure to exercise ordinary care.

" 'Ordinary care' as used herein, means that degree of care usually exercised by an ordinarily prudent person under the same or like circumstances."

It is contended that this instruction assumes that defendants were negligent in allowing or permitting the boards comprising the sixth step to be "uneven and insufficiently supported" and that the instruction assumes that this was negligence, as a matter of law. Clearly the instruction does not make any such assumption. The insertion of the word "negligently" before the word "allowed" does not amount to an assumption that defendants allowed and permitted the board to be "uneven and insufficiently supported." [Kirk v. K. C. Terminal Ry. Co., 27 S. W. (2d) 739, 745 and cases cited therein.] The instruction does not predicate a recovery alone upon the fact that the boards of the step were "uneven and insufficiently supported," provided the jury so found, but goes on and has the jury find, in addition, that the boards were uneven and insufficiently supported so that when persons stepped on the step the board would spring down, causing an uneven surface on the step; that the carpet was loose; that such conditions were not reasonably safe for persons using the steps; that defendant knew of the situation in time to have remedied it; that while plaintiff was using care for her own safety her foot caught causing her to fall to her injury on account of the conditions present. *The instruction then defines the words "negligently" and "ordinary care."* There is no question but that there is no assumption whatever made in the instruction. [Alewel v. East St. Louis Ry. Co., 26 S. W. (2d) 869, 872, 873.]

The instruction does not assume that the boards were "uneven and insufficiently supported," nor does the use of the word "negligently" assume negligence. [Ward v. Mo Pac. Ry. Co., 311 Mo. 92, 106.] The case last cited overruled Eudy v. U. S. Federal Lead Co., 220 S. W. 504, relied upon by defendants.

However, it is claimed that the instruction assumes that "when persons stepped on such step the board or boards therein would spring and give down and that it further assumes that if the board or boards did spring and give down this could cause an 'uneven surface on such step.' " There is no merit in this contention. [Conrad v. Hamra, 253 S. W. 808; Ward v. Ry. Co., supra; Costello v. Kansas City, 219 S. W. 386, 391; Devoy v. St. Louis Transit Co., 192 Mo. 197; Sparks v. Harvey, 214 S. W. 249.]

It is contended that the instruction is erroneous because it fails to require the jury to find that defendant after the knowledge of

the unsafe condition of the step, negligently failed to remedy same. There is no claim that there was any attempt made to remedy the condition. The instruction submits that the step was not reasonably safe and defendants knew of its condition in time to have remedied it, by the exercise of ordinary care. If the jury found the things submitted in the instruction then, as a matter of law, defendants were negligent in not remedying the situation. There is no merit in this contention.

Complaint is made of the giving of plaintiff's instruction No. 2, which reads as follows:

"The court instructs the jury that if you find the issues for the plaintiff then in determining her damages, if any, you may take into consideration the character and extent of plaintiff's injuries, if any, the bodily pain and suffering directly resulting from her injuries, if any, their continuance, if reasonably certain to be permanent, as shown by the evidence if any, the expense necessarily *incurred* by her in the treatment of her injuries, if any, for doctor bills, and hospital bills and such sums as you may find she lost in wages or salary as the result of such injuries as shown by the evidence, if any, and you may allow her such sums as you may find from the evidence as will fairly and reasonably compensate her for such injuries and suffering she has received and endured, if any, as a result of her injuries, if any." (Italics ours.)

The petition asked for $350 for medical and surgical attention and $150 for hospital expenses. At the conclusion of the evidence the petition was amended changing the $350 item to $489. Instruction No. 2 authorizes the jury to consider the expenses necessarily incurred by plaintiff for doctor bills and hospital bills without placing any limit on that amount. There is evidence tending to show that the doctor bills were greater than the amount alleged in the petition. Defendants state that if the proof had shown a lesser amount of doctor bills than that claimed in the petition and the instruction had not limited the allowance for such item to the amount claimed in the petition, the instruction would not have been erroneous. But it is said that the proof, having shown a greater amount than that sued for and there being no limit of the amount to that prayed in the petition, the instruction was erroneous. Defendants' contention is meritorious unless the fact that there was no objection to the testimony concerning the amount of the doctors' bills affects the situation. [Huhn v. Ruprecht, 2 S. W. (2d) 760, 763; Laycock v. United Ry. Co., 290 Mo. 344, 356; Leighton v. Davis, 260 S. W. 986; Radtke v. St. Louis Basket & Box Co., 229 Mo. 1; Smoot v. Kansas City, 194 Mo. 513; Tinkle v. St. Louis & S. F. R. R. Co., 212 Mo. 445; Finley v. United Rys. Co., 238 Mo. 6; Haake v. Milling Co., 168 Mo. App. 177.]

None of the cases last cited disclose whether the evidence in those cases, enlarging the amount claimed in the petition, was objected to. Defendants claim that the evidence in the case at bar shows that the doctors' bills were either $486 or $536. These figures are correct providing Dr. Sanders gave credit to plaintiff for the twenty-five dollars that she paid him. and there is no evidence that he did. so. If the amendment had placed the doctors' bills at $536, or fifty dollars more than the amended amount, it is conceded that the instruction would not have been erroneous on the ground now under discussion. However, the evidence as to the amount of the doctors' bills was unobjected to and plaintiff would have had the right, when she made the amendment, to amend so as to ask for $536 instead of $486 and, under the circumstances, the petition now, in this court, will be considered as so amended. [Sections 1272, 1276, 1277, 1513, 1550 and 1551, R. S. 1919; Chartrand v. So. Ry. Co., 37 Mo. App. 425, 428, 429; Ford v. Transfer Co., 318 Mo. 723, 733, 734; Schneider v. St. Jos. Ry. Lt. H. & P. Co., 238 S. W. 468; Chilton v. Cady, 250 S. W. 403; Rippee v. K. C. & F. S. & M. Ry. Co., 154 Mo. 358; Bammert v. Kenefick, 261 S. W. 78, 82; Frant Hart Realty Co. v. Ryan, 218 S. W. 412; Scholl v. Grayson, 147 Mo. App. 652; Albin v. C. R. I. & P. R. R., 103 Mo. App. 308; Franklin v. M. K. & T. Ry. Co., 97 Mo. App. 473.]

It is claimed that the instruction was erroneous for the further reason that the petition asks for $489 *expended* for medical and surgical attention and $150 for bills *incurred* for hospital bills, whereas, the instruction authorizes the jury to take into consideration the ''expenses necessarily *incurred* by her in the treatment of her injuries, if. any, for doctor bills and hospital bills, etc. (Italics ours.) It thus will be seen that plaintiff, in her petition, asks for the amount *expended* for medical and surgical attention, whereas, the instruction tells the jury that it might consider the expenses necessarily *incurred* for doctor bills and hospital bills. She did not ask in her petition for doctor bills *incurred* but only for doctor bills *expended* and hospital bills *incurred*. There are cases holding such an instruction erroneous under the circumstances (see Stanley v. Railroad, 112 Mo. App. 601; Gibbs v. Light & Power Co., 142 Mo. App. 19; Muth v. Ry., 87 Mo. App. 422) but in view of the fact that, in this case, there was no objection to the testimony showing that the doctors' bills had been incurred and not paid, there is no merit in the contention. [Spengler v. Transit Co., 108 Mo. App. 329.]

It is insisted that the instruction is erroneous for the reason that it allows a recovery for permanent injuries, whereas the evidence fails to show any such injuries. The evidence shows that plaintiff in falling struck her head against the wall; that the blow was so severe as to cause swelling and tenderness over her left eye and resulted in puss forming in the sinus above the eye. Plaintiff was

operated upon for the sinus trouble and, while the wound healed up "very quickly," she was left, at the time of the trial, with conjunctivitis and impaired vision. Dr. Jackson testified that he could not tell whether plaintiff's condition was permanent; that he was not an eye specialist "and not conversant very much with the eye" and could not "say to what extent her eyesight is affected." Dr. Sanders testified:

"Q. Is it permanent or is it a matter that can be cured up? A. Well, I had hoped it would be cured a long time ago, but it is not, so I am inclined to think there is more or less permanency with it.

"Q. What effect will that have upon her health? A. Anybody that has pain naturally will cause a person's health to deteriorate.

"Q. Has her health deteriorated in that way? A. I think so. I don't think she is as good as when I first met her."

Plaintiff testified that her eyesight is impaired; that the doctor prescribed glasses for her which she wears; that she suffers from severe headaches and "I take a pain across my forehead and then my eye becomes inflamed;" that she was so ill after her fall that she could not return to work for seven months; that she has received a raise in wages since returning to work and now earns more than before the receipt of her injury.

It is contended that the testimony of Dr. Sanders that "I am *inclined to think* there is more or less permanency with it" does not meet the test of reasonable certainty of permanency as required in the cases of Steinsmann v. Transit Co., 116 Mo. pp. 673, 678, and Lebrecht v. United Rys., 237 S. W. 112. We rule this point against the defendants. Reading the whole of Dr. Sanders' testimony it discloses that plaintiff's health has deteriorated and that in view of the fact plaintiff's trouble still persisted (the trial being two years and four months after the receipt of the injury) he was inclined to think there was more or less permanency in her condition. From this and the other testimony on the subject of plaintiff's condition, the jury was authorized to conclude that the injury was permanent. [Wulze v. Aquardo, 6 S. W. (2d) 1017, 1019.]

The judgment is affirmed. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.