Terry Powers FORD,
Plaintiff-Respondent,

v.

Audrey MONROE and Farmers and Merchants Insurance Company, a corporation, Defendants-Appellants.

No. 10438.

Missouri Court of Appeals,
Springfield District.

Dec. 6, 1977.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 21, 1977.

---

Robert A. Dempster, Phillip J. Barkett, Jr., Dempster, Yokley, Fuchs & Barkett, Sikeston, for plaintiff-respondent.

J. Lee Purcell, Hyde, Purcell, Wilhoit & Edmundson, Poplar Bluff, for defendants-appellants.

Before BILLINGS, C. J., and TITUS and FLANIGAN, JJ.

TITUS, Judge.

Plaintiff sued defendant Audrey Monroe (Monroe) and Monroe's automobile liability insurance carrier, defendant Farmers & Merchants Insurance Company (Farmers), to recover damages plaintiff had sustained as the result of having been shot by an unknown assailant. Count I of the petition prayed for a $25,000 judgment against Monroe because of that defendant's alleged negligence. Count II asked for a $25,000 judgment against Farmers under the Uninsured Motorist provision of its policy. Count III sought a $500 judgment against Farmers under the Medical section of the policy. After a jury-waived trial, the court entered judgment for plaintiff as follows: $35,000 on Count I; $10,000 on Count II; and $500 on Count III. (The apt reader will see that the sum awarded on Count I exceeded the petition prayer by $10,000). Defendants appealed.

On the date in question plaintiff and Monroe, respectively 26 and 30 year old white females, were traveling on Route DD in Scott County in a 1965 Plymouth automobile owned and driven by Monroe. Monroe had obtained her driver's license only two months before. Plaintiff, seated on the right side of the front seat, was the sole passenger. Route DD is described as being a two-lane, blacktop east-west road.

As the westbound Plymouth passed through Vanduser shortly after midnight en route to Bloomfield, an "old model" Ford drove off a side street, pulled in behind the Plymouth and followed it "around four miles," during which time, plaintiff said, "[t]hey was blinking their lights on and off trying to get us to stop the car." Plaintiff testified, denied by Monroe, that Monroe wanted "to stop and asked them what they wanted, and I kept repeating [to] her not to stop the car, that I was afraid we were going to be hurt." Neither plaintiff nor Monroe at this time or later knew the identity or number of persons occupying the Ford. Eventually, the Ford overtook and passed the Plymouth and stopped on a "floodway bridge" blocking the roadway. Monroe stopped the Plymouth and started to "move the car backwards" toward the east. At this time plaintiff said "[t]he colored people", who had gotten out of the Ford, "got in their car and pulled over a little" and turned around headed east. The record indicates that Monroe was not then aware that "colored people" occupied the Ford. When the Ford commenced to travel east, Monroe started forward (westward) across the bridge. After the Ford was to the rear of the Plymouth, it was turned

around so that it was again traveling west. Plaintiff testified that the Plymouth had "just started to move . . . slowly . . . forward" when the Ford came alongside of the Plymouth. This was the first time either plaintiff or Monroe saw that an occupant of the Ford had a gun. Monroe recounted that after the Plymouth crossed the bridge she was driving 50 to 60 miles an hour, but when the Ford pulled alongside she was driving 40 miles an hour because she "hadn't been driving very long [and] I didn't want to lose control of the car." Monroe also testified she was unaware that "it was blacks in the" Ford until "I saw this one black face when the [Ford] drove up right alongside of us." Just as the Ford came abreast of the Plymouth, two shots were fired from the Ford in rapid succession. The first shot broke the left door glass of the Plymouth and the bullet struck Monroe on the left side of her head. The second bullet apparently traveled through the broken window and struck the plaintiff. There was no physical contact between the two vehicles, and Monroe managed to keep the Plymouth under control so that it did not collide with any object after the shooting.

### Count I

Monroe's alleged negligence purportedly occurred between the time when the Ford, after being stopped ahead of the Plymouth, was driven off the floodway bridge and turned around and the time when the Ford, having been turned around again at the rear of the Plymouth, was driven westward alongside of the Plymouth and the shots fired. In summary, plaintiff says "that but for the action or inaction of Monroe [during the aforesaid period] in failing to cause her motor vehicle to leave the scene at a fast speed, to do everything that she could to protect her passenger, the [plaintiff] would not have been injured."

In its conclusion of law, with which we disagree in part, the trial court said: "The law in Missouri is that a driver of a vehicle owes a passenger a duty to exercise the highest degree of care for the safety of the passenger. Where a situation arises that indicates a situation where danger is present or can be reasonably anticipated, the driver must take such steps as are available to protect the passenger. The defendant Monroe did not, in this case and under the facts shown in the evidence, exercise the highest degree of care for the protection of plaintiff Ford." This conclusion of the trial court was predicated on its finding of fact that when "the unidentified vehicle [the Ford] pulled up next to [Monroe's Plymouth,] the Monroe vehicle was either stopped or moving very slowly."

In *Hay v. Ham*, 364 S.W.2d 118, 122 [1–2] (Mo.App.1962), Judge Cross observed that the underlying purpose of subsec. 1 of Sec. 304.010 [1], V.A.M.S., "is the protection of life, limb and property of all persons from destruction or damage resulting *from the operation of motor vehicles on the public highways*" and that it is a court's duty to reasonably interpret the statute "so that the legislature's purpose in enacting that law shall prevail and not so as to defeat the obvious intention of the lawmakers." (Our emphasis). The statute, in our view, was intended to require operators of motor vehicles upon the highways to exercise the highest degree of care to save all persons from harm proximately resulting from the operation of those vehicles. If the harm sustained does not proximately arise from the operation of the vehicle on the highway but is proximately caused by a criminal attack of third persons, it is our opinion that any attempt to impose upon the operator the duty to exercise the highest degree of care to protect a passenger from such a criminal attack would be an unauthorized interpolation of the law and a corruption of the General Assembly's purpose in enacting the statute.

---

1. Sec. 304.010–1. Every person operating a motor vehicle on the highways of this state shall drive the vehicle in a careful and prudent manner and at a rate of speed so as not to endanger the property of another or the life or limb of any person and shall exercise the highest degree of care.

■ Absent special circumstances or relationships not present here, it is the general rule that a private person has no duty to protect another from a deliberate criminal attack by a third person. Annot., 10 A.L.R.3d 619, 626 et seq. A cause of action for negligence, if successful, depends (a) upon defendant's breach of a duty to exercise the required quantum of care to avoid injury to plaintiff, and (b) upon damage or injury suffered by plaintiff as a proximate consequence of the violation of that duty. 57 Am.Jur.2d, Negligence, § 64, at p. 415. A fortiori, if no duty exists, there can be no violation of a duty upon which to predicate a recovery. On the other hand if it be assumed, arguendo, that defendant was negligent in the first instance, it is a general principle that if a criminal act by a third person intervenes and produces plaintiff's injury which was not intended by defendant and could not have reasonably been foreseen by him, the causal chain between the defendant's negligence and the plaintiff's injury is broken. *Sira v. Wabash Ry. Co.*, 115 Mo. 127, 21 S.W. 905 (1893); 57 Am.Jur.2d, Negligence, § 206, pp. 580–583. Or, as otherwise expressed in Restatement, Second, Torts § 448: "The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime." Comment a., under § 448, states, inter alia: "Under the rule stated in this Section, the actor is not responsible for the harm thus inflicted [by a third person] merely because the situation which his negligence has created has afforded an opportunity or temptation for its infliction."

■ Should we presuppose, for reasons not clear to us, that Monroe was negligent under the circumstances because she did not attempt to outdistance the Ford by suddenly accelerating the Plymouth to unknown and undetermined high rates of speed, her omission to so do neither supplied nor set in action any dangerous instrumentality or agency. The omission merely created a situation which made it less difficult than it otherwise would have been, for the assailants to inflict the harm. Plaintiff's injuries and damages resulted from a violent and malicious act of unknown assailants for some purpose not disclosed. The crime committed by the assailants was not foreseeable by Monroe and did not originate with Monroe or with the manner in which she operated the Plymouth. *Fraser v. Chicago, R.I. & P. Ry. Co.*, 101 Kan. 122, 165 P. 831, 833[1] (1917). The judgment nisi as it relates to Count I is reversed.

### Count II

■ Farmers' policy written on the Monroe Plymouth provided "Protection Against Uninsured Motorists." By its policy, Farmers contracted: "To pay all sums which the insured . . . shall be legally entitled to recover as damages from the owner or operator of an uninsured automobile because of bodily injury . . . sustained by the insured, caused by accident and arising out of the ownership, maintenance or use of such uninsured automobile." The word "insured" was defined to include "(b) any other person while occupying an insured automobile." The term "uninsured automobile . . . means: . . . (b) a hit-and-run automobile [and] 'hit-and-run automobile' means an automobile which causes bodily injury to an insured arising out of physical contact of such automobile with the insured or with an automobile which the insured is occupying at the time of the accident."

There was no physical contact between the Ford and the Plymouth. The Ford was unidentified except as being an "old model" Ford, making it but one of a legion. The driver and occupants of the Ford were unknown. Under these circumstances the "hit-and-run" provisions of Farmers' policy, supra, is of no benefit to plaintiff because it is expressly and unambiguously limited to situations where bodily injuries arise "out

of physical contact of [the uninsured] automobile with the insured or with an automobile which the insured is occupying at the time of the accident." *Ward v. Allstate Insurance Company*, 514 S.W.2d 576, 578 (Mo. banc 1974). Furthermore, as the other driver and vehicle were unidentifiable, the provisions of the "Uninsured Motorist Statute," § 379.203, V.A.M.S., offer no assistance to plaintiff. *Ward*, supra, at 579[3].

The fact that the unknown assailant's first bullet struck and broke the door glass of the Plymouth, or the fact that his second bullet struck and injured plaintiff, affords plaintiff no succor for two reasons. As noted, the "hit-and-run" policy provisions require physical contact by the uninsured automobile with either the plaintiff or the Plymouth. Neither bullet qualified as an uninsured automobile any more than did a bottle tossed from an unknown automobile which struck an insured vehicle and injured its driver. *Aetna Casualty & Surety Company v. Head*, 240 So.2d 280 (Miss.1970). Likewise, it cannot be properly said that the bullet-injury sustained by plaintiff was "caused by accident and arising out of the ownership, maintenance or use of such uninsured automobile." *Mazon v. Farmers Insurance Exchange*, 107 Ariz. 601, 491 P.2d 455 (banc 1971), vacating opinion reported in 13 Ariz.App. 298, 475 P.2d 957 (1970). The Supreme Court of Arizona said in *Mazon*, supra, 491 P.2d at 457[1]: " . . . we can find no causal relationship between an injury resulting from a stone thrown by an unknown person from an unidentifiable vehicle, and the ownership, maintenance or use of that vehicle. Therefore under the facts presented, [plaintiff] is not entitled to recover under [the uninsured motorist provisions] of the insurance contract." The judgment nisi as it relates to Count II is reversed.

### Count III

The medical payment coverage has not been submitted or argued on appeal. We treat any complaints that Farmers may have had as to Count III as abandoned. The judgment nisi as it relates to Count III is affirmed.

Respondent's motion to dismiss or to limit issues heretofore filed and taken with the case is denied.

For the reasons stated, the judgment as it relates to Counts I and II is reversed but is affirmed as it relates to Count III. Accordingly, the cause is remanded to the trial court to enter judgment in favor of defendant Audrey Monroe and against plaintiff on Count I of the petition, in favor of defendant Farmers and Merchants Insurance Company and against plaintiff on Count II of the petition, and in favor of plaintiff and against defendant Farmers and Merchants Insurance Company in the sum of $500 on Count III of the petition.

All concur.