VIRGINIA D., Plaintiff-Appellant,
v.
MADESCO INVESTMENT CORP., d/b/a
Bel Air Hilton Hotel,
Defendant-Respondent.

No. 64183.

Supreme Court of Missouri,
En Banc.

March 29, 1983.

As Modified on Denial of Rehearing
April 26, 1983.

Richard E. Schwartz, St. Louis, for plaintiff-appellant.

Lawrence B. Grebel, Donald L. James, St. Louis, for defendant-respondent.

William Edward Taylor, St. Louis, for amicus curiae Women's Self Help Center.

BLACKMAR, Judge.

The plaintiff complained that she had been assaulted and sexually molested by a male intruder in a ladies' restroom of a motor hotel and that the defendant hotel operator was negligent in various respects.[1] The petition alleged that the defendant

---

1. The petition charged negligence in failing to provide a restroom attendant, failing to provide a uniformed security guard, failing to maintain a system of internal surveillance, failure to alert employees and to provide them with security training, failing to provide warning, and otherwise.

knew, or in the exercise of due care should have known, of the possibility that an assailant might conceal himself in the restroom, and that it was therefore dangerous. The plaintiff had a nine-juror verdict for $100,000. The defendant moved for judgment in accordance with its motion for a directed verdict at the close of all the evidence but filed no motion for a new trial. The trial court sustained the motion for judgment, accompanying the order with a thorough opinion analyzing cases from Missouri and other jurisdictions. The Court of Appeals affirmed the judgment for the defendant by a two to one vote, with each member of the panel delivering an opinion, and we accepted transfer. We conclude that the plaintiff made a submissible case of negligence and that the trial court was in error in entering judgment for the defendant notwithstanding the verdict. Since the defendant, following the verdict, raised no point of trial error, of the form of submission,[2] or as to the amount of the verdict, we reverse and remand with directions to reinstate the judgment for the plaintiff on the jury's verdict.

Bel Air Hilton is a first class motor hotel located just across the street from Mansion House Center in the easternmost portion of downtown St. Louis, near the two downtown bus stations and Interstate 70. It has 17 stories, with an attached parking garage having access to the hotel elevators on six levels. The hotel has an upper lobby at street level containing the registration and cashiers windows, a small gift shop, and the entrances to the two restaurants. There are two revolving doors on the west side facing Fourth Street, one near the registration area and the other opposite the entrance to Trader Vic's, one of the restaurants in the hotel. Each of the revolving doors has a hinged door on each side. There is also a rear entrance used by employees, and for making deliveries. The lower lobby may be reached by a flight of stairs from the main floor or by elevator from any level of the hotel. The hotel offices are located off the lower lobby, as are men's and ladies' restrooms, the latter being the scene of the events involved in this case. The lower level also contains banquet and meeting rooms.

Besides Trader Vic's, the hotel has a Miss Hullings restaurant. The restaurants are apparently under separate ownership, utilizing leased space, but the evidence would support a finding that they are integral parts of the hotel complex. Both restaurants serve liquor.

After work on September 24, 1976 the plaintiff and some friends went to the Miss Hullings restaurant intending to eat dinner. They arrived before the dinner hour and ordered beer. One of the plaintiff's companions left to use the restroom and returned after about five minutes. Miss Hullings has no public restrooms. Patrons of Miss Hullings could use the restrooms in Trader Vic's or those on the lower level of the hotel. After her companion returned the plaintiff went to the restroom, deciding to use the lower level facilities because Trader Vic's restrooms can be reached only through a noisy bar.

The plaintiff probably visited the restroom at about 5:30 p.m. She testified that she saw nobody in the lower lobby or in the ladies' restroom before entering the cubicle. There had been a meeting on the lower level during the day but it had adjourned and the banquet room was being set up for an evening affair for the same group, with

---

2. Plaintiff's verdict director, based on MAI 22.-05, is as follows:

INSTRUCTION NO. 2

Your verdict must be for the Plaintiff if you believe:

First, there was a danger that an assailant might attack a person in the ladies restroom and as a result the ladies restroom was not reasonably safe, and

Second, Defendant knew or by using reasonable care should have known of this condition, and

Third, Defendant failed to use ordinary care to make the ladies restroom reasonably safe, and

Fourth, as a direct result of such failure, Plaintiff was injured.

The defendant has not challenged the giving of this instruction and we are not called upon to approve or disapprove it.

six to eight people working there. The doors from the lower lobby to the banquet room were open. The usual quitting hour for employees in the office was 5:00 p.m. Operations Manager Raymond Baddock was still there, and he testified that three other employees were also. The restroom consists of a toilet room and a lavatory room, separated by walls, with a rather narrow passage. As the plaintiff was leaving the cubicle she was grabbed from behind by a man, threatened, and sexually abused. Since the defendant does not deny the attack, and does not challenge the amount of the verdict, further detail is not necessary. The attacker ran out of the restroom, pursued by a bellhop who had gone to the lower level to move some suitcases and heard the plaintiff's screams. Baddock also heard the screams and joined the chase, as did other employees. The bellhop made the capture and the plaintiff noted the hour as 5:48 p.m.

The assailant was arrested, identified, and eventually sentenced on a plea of guilty. There is some variation in the evidence as to his manner of dress, but all witnesses agreed that nothing in his appearance would have caused any hotel employee to detain or question him if he had been seen to enter the hotel by one of the street level doors and then to enter the elevator or go down the stairs to the lower lobby. Any person who presented a reasonably neat appearance and was not obviously intoxicated or otherwise disorderly would be allowed to enter the hotel for the purpose of using the lower level restrooms. Nor would it be difficult to enter the garage on foot, since there was only one attendant and he would often be involved in checking cars out.

There was substantial evidence that persons having no proper business in the hotel and not scrupulous about respect for law and property entered with some regularity and were a cause of concern to the hotel authorities. Management was on the alert

for prostitutes. Former manager Charles Powers testified that they would sometimes take the elevators to the upper floors, while Baddock said that they operated in the restaurants and bars. Vandalism and "burglary" of automobiles occurred in the garage. Young boys created problems by gathering in the lower lobby, sometimes two or three times a week. There had been vandalism in the men's restroom and coins were removed from the "wishing pool" at the foot of the stairs. A person who had worked at the hotel as a security guard expressed concern about thefts from the gift shop. On one occasion an "arsenal" was found in a room, apparently brought in by registered guests. There was, however, no evidence of recent incidents of rape, assault, robbery or other violent crime in or near the hotel.[3] Nor was there any evidence of previous criminal activity or violence in the lower level ladies' room.

No employees of the hotel were regularly stationed in the lower lobby, in positions from which they could observe the lobby and the adjoining restroom area. The four to six women who worked in the hotel offices used this restroom, and it may be assumed that it would have been in heavy use during a banquet or meeting on the lower level. The hotel had no television monitor in the lower lobby but did maintain one at the back door. There was a single security officer on duty 24 hours a day, supplied under contract by a private agency. This agency had recommended that an additional guard or guards be employed. The security officer's regular rounds took him elsewhere at the time the plaintiff was attacked, and he did not regularly visit the lower lobby. There was evidence that the downstairs restrooms had been locked after 5:00 p.m. in the past as a security measure, when there were no evening functions scheduled in the banquet rooms.[4] The manager of Miss Hullings complained and the practice was abandoned.

3. The trial court excluded evidence of an assault in 1971 and a reported rape in a guest room in 1973 as too remote.

4. Section 315.150, RSMo 1978 requires each hotel to have "a main public washroom, convenient and of easy access to guests," but has no specification as to location, size or design.

■ Much of the testimony about security measures came from Charles Powers, former Operations Manager, who was either fired or forced to resign, and who last worked at the hotel approximately five days before the attack took place. He testified that during his tenure as manager he was concerned about security in the lower lobby and about the problems of the gathering there of persons having no proper business. It was his idea to lock the lower lobby restroom doors, and also to install an accordion gate at the head of the stairs in the upper lobby which could be locked when the area was not being used. This latter idea was rejected by Powers' superior because of its adverse effect on the decor of the upper lobby.[5] Powers testified that matters of expense figured prominently in decisions about security. Questions of his bias as a disgruntled former employee, and of the security agency's self-interest in recommending additional guards, of course are for the jury. There was testimony about the condition of lighting in the lower lobby and about the substitution, at one time, of bulbs of lower wattage as an economy measure. The plaintiff, however, did not complain about the lighting conditions and we do not believe that evidence of dim lighting contributes substantially to the submissibility of her case.

Baddock, manager of the hotel at the time of the incident and president of the hotel corporation at the time of trial, expressed the opinion that the overall performance of the security system could have been a little more efficient. The management tried to exclude or eject people who did not have legitimate business in the hotel, including drunks, bums, prostitutes, and idlers. Baddock recognized that "anyone could walk into the lobby," and that anyone who could get by the attendant could walk into the garage. He was aware that rape could happen in the hotel and recognized this as a part of the overall security problem. He had considered the installation of an additional TV monitor in the banquet preparation area, which was a private area on the lower level but not near the restrooms.

Lt. Col. Atkins Warren, the third ranking officer of the St. Louis Police Department, was subpoenaed by the defendant and placed on the stand. He said that the area in which the hotel was situated was a low frequency area for crime as compared to other areas of the city as a whole, but that crime occasionally occurs everywhere. If groups of young men hung around in the lower lobby he would recognize the area as a problem area for possible violent crime or purse snatching, and the possibility of violent crime in the restrooms would exist. He testified that the presence of people deters crime.

The plaintiff produced a witness with police training who markets her services as an expert and consultant on security problems for hotels and other businesses. She criticized the design of the ladies' restroom and expressed the opinion that the plaintiff might better have been able to discover an intruder and to protect herself if there had been modifications in design. The witness criticized particularly the "maze" or corridor between the lavatory and the toilet area, the absence of mirrors which would make it easier to discover an intruder in the toilet area, and the failure to design cubicle doors which would stand open so that a woman entering the stalls could see if any were occupied. She also said that she found it easy to walk into the "non public" areas of the hotel, where only employees were supposed to be present.

■ There is a special relationship between hotel operators, whom the law has traditionally called innkeepers, and their guests, so as to impose affirmative duties in the protection of persons and property.[6]

---

5. The Chairman of the Board of the defendant testified that a gate so installed would be "a flagrant violation of the fire code," but he gave no further explanation. The evidence showed that there was another stairway from the regis-

tration area at street level to the executive offices at the lower level.

6. Restatement (Second) of Torts, § 314A(1), (2), 315(a) (1965); *Phegley v. Graham*, 358 Mo. 551, 215 S.W.2d 499 (Mo.1948); *Lonnecker v.*

This duty encompasses more than the duty owed by the owner of business premises to invitees.[7] It is owed to those who come for food and drink just as to those who take rooms,[8] and extends to patrons of separately owned and operated eating establishments in a situation such as this one, in which the restaurants are an integral part of the hotel operation and are accessible through the hotel lobby.[9]

The claimant must establish the elements of a negligence claim—that is, duty, breach of duty, and causation. *Scheibel v. Hillis*, 531 S.W.2d 285, 288 (Mo.1976); Restatement (Second) of Torts § 281 (1965). The cases say uniformly that the innkeeper is not an insurer. The special relationship establishing the duties of the innkeeper to guests has been compared to the relationship between a common carrier and its passengers. Although a recent case, *Shute v. Prom Motor Hotel, Inc.*, 446 S.W.2d 137, 140 (Mo.App.1969), speaks of a "very high" degree of care, the defendant argues that the innkeeper's duty is only one of ordinary care.[10] We need not resolve the issue, since this plaintiff submitted her case only on "ordinary care," and had a verdict on this instruction. The phrases describing different degrees of care, moreover, are designed to be communicated to juries, rather than indicating a standard to be applied by the court in determining whether the plaintiff has made a submissible case.[11]

The defendant's arguments may be summarized as follows: (1) there was no duty to take special precautions against events of the kind that befell the plaintiff, since nothing of this sort had happened in the relevant past; (2) there was no breach of duty in failing to detect the presence of the assailant or to warn him off the property, since nothing in his appearance or conduct prior to the attack gave any indication that he was a dangerous person; and (3) the element of causation has not been established because there is no assurance that the suggested security precautions, had they been in place, would have inhibited the attack. The trial court and the Court of Appeals appear to accept the first two arguments.

Many lawsuits have been filed against owners of business premises on account of criminal assaults against invitees. There are extensive annotations in 70 A.L.R.2d 628, 10 A.L.R.3d 619, and 43 A.L.R.3d 331. Most claimants have been unsuccessful. Sometimes courts base denial of recovery on principles of foreseeability. *Cf. Irby v. St. Louis Cab Co.*, 560 S.W.2d 392, 395 (Mo. App.1977); sometimes it is said that the criminal act is an intervening or superseding cause. *Ford v. Monroe*, 559 S.W.2d 759, 762 (Mo.App.1977).

The defendant, and the courts below, place strong reliance on Judge McMillian's opinion in *Irby, supra*. There a petition

*Borris*, 360 Mo. 529, 229 S.W.2d 524 (Mo.1950); *Shute v. Prom Motor Hotel, Inc.*, 446 S.W.2d 137 (Mo.App.1969); *Dalzell v. Dean Hotel Company*, 193 Mo.App. 379, 186 S.W. 41 (1916); *Anderson v. Malloy*, 700 F.2d 1208 (8th Cir.1983); Annot., 70 A.L.R.2d 628, 645–6.

7. *Wilder v. Chase Resorts, Inc.*, 543 S.W.2d 527 (Mo.App.1976); *Burnison v. Souders*, 225 Mo. App. 1159, 35 S.W.2d 619 (Mo.App.1931).

8. *Cumming v. Allied Hotel Corp.*, 144 S.W.2d 177 (Mo.App.1940), (Dicta); *Wilder v. Chase Resorts, Inc.*, 543 S.W.2d 527 (Mo.App.1976) (minimizing the importance of registration by the guest).

9. *See Metzler v. Terminal Hotel Co.*, 135 Mo. App. 410, 115 S.W. 1037 (1909); *Blue Grass Restaurant Co. v. Franklin*, 424 S.W.2d 594 (Ky.App.1968).

10. The defendants cite *Lonnecker v. Borris*, 360 Mo. 529, 229 S.W.2d 524 (Mo.1950) and *Phegley v. Graham*, 358 Mo. 551, 215 S.W.2d 499, 503 (Mo.1948), for the proposition that only ordinary care is required of an innkeeper in the protection of guests. Neither case fully supports the proposition, since in each the plaintiff had recovered a verdict based on an "ordinary care" submission. *Phegley* quotes with approval New York cases which speak of "at least ordinary care."

11. "The prevailing view is that there are no 'degrees' of care or negligence, as a matter of law; there are only different amounts of care as a matter of fact; ..." Prosser, *Torts*, 182; 206–7 (4th ed. 1971).

alleging that a cab company was negligent in dispatching an independent contractor driver into a "high crime" neighborhood was held to be properly dismissed for failure to state a claim because it failed to show that the defendant had a duty to protect the plaintiff from criminal acts, in the absence of "special facts" or a "special relationship," which the pleading, in spite of repeated amendments, did not show. The case was not an innkeeper case, and did not even involve injury to an invitee on the defendant's commercial premises. The decision can be fully justified on the basis that the defendant was no better equipped to anticipate and to guard against crime than was the plaintiff.[12]

■ Any suggestion that crime is not foreseeable is particularly inappropriate when a downtown metropolitan area is involved, especially when the case involves a hotel.[13] Our traditional innkeeper statutes, in providing that an innkeeper may provide a safe for valuables and may avoid extraordinary liabilities by posting notice of its availability, recognize that hotels are very public places and that guests may be the victims of crime. §§ 419.010–020, RSMo 1978. Colonel Warren, in saying that there is some crime everywhere, and Manager Baddock, in testifying that rape was a possibility, simply reflect common experience, as did the trial judge in his statement that

"rape can occur anywhere." Certain people, for reasons we do not fully understand, are disposed toward violent crime, and act without apparent motive. Some men subject women who are strangers to atrocious physical indignities. The operator of a hotel to which the public has easy access, in the discharge of the duties imposed on account of the innkeeper's special relationship to the guests, should not be heard to say that he had no inkling that crime of the kind here involved might occur on his premises simply because there had been none in the past. There is no requirement that there be at least one mugging or rape before the innkeeper is obliged to consider the possibility. The duty is one of the appropriate degree of care under the circumstances.

■ The defendant cites some of the numerous cases holding that a hotel operator, or other owner of premises to which the public is invited, is not liable for the consequences of a sudden and unanticipated assault, committed by a person who has given no prior reason for suspicion.[14] We agree that the defendant could not be found negligent on the basis of the assailant's presence in the hotel, but only up to the point at which he entered the ladies' room. Had his entry there been observed by a hotel employee, an immediate duty to take action would have arisen.[15] But the entry was not

12. On lack of foreseeability of criminal conduct see *Prosser, supra,* 73, cited in *Irby; Goldberg v. Housing Authority,* 38 N.J. 578, 186 A.2d 291 (1967); Annot., 10 A.L.R.3d 619; *see also Lige v. Chicago, B. & Q.R. Co.,* 275 Mo. 249, 204 S.W. 508 (1918), which is ill-considered since it involved both a special relationship of passenger and carrier and the special fact of intoxication, and seems contrary to *Hughes v. St. Louis National League Baseball Club, Inc.,* 359 Mo. 993, 224 S.W.2d 989 (Mo. banc 1949).

13. *Kline v. 1500 Massachusetts Avenue Apartment Corp.,* 141 App.D.C. 370, 439 F.2d 477 (1970) (involving an apartment hotel but discussing innkeeper law in depth). *See also Scheibel v. Hillis,* 531 S.W.2d 285 (Mo.1976) (holding that negligence may be predicated on the foreseeable acts of third persons); Restatement (Second) of Torts § 302B, 344, and particularly Comment f (1965); Bazyler, "The Duty to Provide Adequate Protection; Landowners' Liability for Failure to Protect Patrons from

Criminal Attack," 21 Ariz.L.Rev. 727, 735 (1979); LeGrand and Leonard, "Civil Suits for Sexual Assault; Compensating Rape Victims," 8 Golden Gate L.Rev. 479 (1979).

14. Among the "hotel" cases so holding are *Reichenbach v. Days Inn of America, Inc.,* 401 So.2d 1366 (Fla.Dist.Ct.App.1981); *Montgomery v. Royal Motel,* 645 P.2d 968 (Nev.1982) (citing cases and announcing a "precipitous assault" doctrine); *Brewer v. Roosevelt Motor Lodge,* 295 A.2d 647 (Me.1972); *Nixon v. Royal Coach Inn of Houston,* 464 S.W.2d 900 (Tex. Civ.App.1971).

15. The problem presented by a man's entry into a ladies' room is entirely different from those presented by such cases as *Townsley v. Cincinnati Gardens, Inc.,* 39 Ohio App.2d 5, 314 N.E.2d 409 (1974); *Corbitt v. Ringley-Crockett, Inc.,* 496 S.W.2d 914 (Tenn.Ct.App.1973); and *Highlands Insurance Co. v. Gilday,* 398 So.2d 834 (Fla.Dist.Ct.App.1981), each involving a

observed. Nothing in the record shows where the attacker came from or when he went into the ladies' room. The plaintiff would have a case for the jury, then, only on the basis that security measures suggested in the evidence could increase the likelihood that the attacker would have been discovered by the plaintiff or somebody else in time to prevent the assault. We must determine whether there is substantial evidence to support such a finding.

 There is ample evidence that persons on the fringe of the law, and some quite over the border, could enter, remain, and misbehave in the hotel without great difficulty. There were continuing problems with prostitutes. "Burglaries" of cars, and thefts, took place in the garage. We do not agree that incidents in the garage are necessarily insufficient to provide warning with regard to the hotel proper, since persons in the garage could easily enter the hotel and could go to any level on the elevator. *See Murphy v. Penn Fruit Co.,* 274 Pa.Super. 427, 418 A.2d 480 (1980). A former security guard at the hotel testified about thefts in the gift shop, off the upper lobby. Then there were problems with young men or boys who gathered in the lower lobby as often as two or three times a week and who probably vandalized the men's room. Colonel Warren testified that persons so assembling would pose potential danger. The jury could find that this evidence of past incidents was sufficient to alert management to the possibility of crime on the premises, so as to invoke the duty of exercising an appropriate degree of care to protect hotel guests from criminal victimization.

 Nor can it be said that the duty of anticipation extends only to crimes similar in nature and seriousness to those that have occurred in the past. *See Orlando Executive Park, Inc. v. P.D.R.,* 402 So.2d 442 (Fla.Dist.Ct.App.1981), (burglaries sufficient to alert hotel operator to possibility of

attack); *Mozlak v. Ettinger,* 25 Ill.App.3d 706, 323 N.E.2d 796 (1975); (attempted break-ins at women's residence indicated possibility of assault); *Jenness v. Sheraton-Cadillac Properties, Inc.,* 48 Mich.App. 723, 211 N.W.2d 106 (1973), (in which hotel employees allowed a prostitute to loiter and she assaulted a guest who refused her solicitations); *Morgan v. Bucks Associates,* 428 F.Supp. 546 (E.D.Pa., 1977), (holding that auto thefts on parking lot should alert owner to danger of assaults, citing Restatement (Second) of Torts § 281, Comment (j) (1965)).

In *Murphy v. Penn Fruit Co., supra,* 418 A.2d at p. 483, the court held that it was proper to instruct the jury that the defendant need not be aware of the exact type of criminal acts that might take place on the premises. There the evidence showed prior non-violent crimes on the defendant's premises, and the defendant was held liable for an attack with a knife on the parking lot. The instruction was more detailed than our practice would permit, but the principle is appropriate to indicate what the jury may consider.

The jury might have sensed that the lower lobby was quite a lonely place after 5 p.m. on September 24, 1977. The meeting participants had departed and most of the employees in the office had left. The employees in the large banquet room, setting up for an evening affair, undoubtedly gave very little attention to the lobby area. Former Manager Powers considered the lower lobby an area of concern, and had tried or suggested various security measures. The jury well might have felt that criminal types might enter the hotel from the street, or even take out rooms, and might gravitate to the lower lobby at a time when traffic was at a minimum, creating the potential for severe harassment or violence directed against guests.

The evidence suggests a variety of possibilities for improving security on the lower

sudden and totally unexpected attack by a man against another man in a men's restroom. The only case we have found involving an attack by a man against a woman in a ladies' restroom is

*Hart v. Hercules Theatre Corp.,* 258 App.Div. 537, 17 N.Y.S.2d 441 (1940), which is not a "special relationship" case.

level, including a television monitor in the lobby, locking the restrooms or a gate which might be placed at the head of the stairs when there are no activities downstairs, detail of an employee who could observe the lower lobby and restroom entrances or of a matron for the ladies' room, and an increase in the security force. Evidence of inadequacy of the security force played a part in the findings of submissibility in *Margreiter v. New Hotel Monteleone, Inc.,* 640 F.2d 508 (5th Cir.1981), and *Nordmann v. National Hotel Co.,* 425 F.2d 1103 (5th Cir.1970), which we read as holding that there was a submissible case on that basis prior to the disregarded warning by another guest; *Peters v. Holiday Inns, Inc.,* 89 Wis.2d 115, 278 N.W.2d 208 (1979), presenting the added fact of the appearance of the assailant at the suspicious hour of 3:00 a.m. *See also Rosier v. Gainsville Inns Associates, Ltd.,* 347 So.2d 1100 (Fla.Dist.Ct.App.1977); *Atamian v. Supermarkets General Corp.,* 146 N.J.Super. 149, 369 A.2d 38 (1976) (involving attacks on a parking lot at a supermarket, after a series of similar incidents); *Phillips Petroleum Co. v. Dorn,* 292 So.2d 429 (Fla.Dist.Ct.App.1974) (rev'd because of error in instruction); *St. Louis, I.M. & S. Ry. Co. v. Hatch,* 116 Tenn. 580, 94 S.W. 671 (1906) (failure of railroad to have attendants present for period of two hours).

■■■■ It is not for us to decide whether any one or more of these measures would be necessary, practical, or effective. All we need say is that the jury might have concluded that precautions were available which might have increased the chances of dissuading the attacker from entering the ladies' room, of discovering his entry, or of interrupting him before he caused substantial harm to the plaintiff. The plaintiff is not obliged to prove that the utilization of security measures would surely have prevented the assault. *Mayer v. Housing Authority of Jersey City,* 84 N.J.Super. 411, 202 A.2d 439, 447 (1964); *Orlando Executive Park, Inc. v. P.D.R.,* 402 So.2d 442 (Fla.Dist.Ct.App.1981) (plaintiff does not have the burden of showing that the security measures would necessarily have been effective).

Evidence of feasibility and cost could also have been presented to the jury. The manager testified that there was a program of security training for employees, but the employee who made the capture, although described as having an important position, said that he had no security training. The jury might well have felt that there had been insufficient attention to security, and that added security precautions might have increased the chances for avoiding the incident.

The evidence of the witness claiming to be a security expert, to the effect that the ladies' room could have been so designed as to increase the possibility that an intruder would have been discovered, was also before the jury. We do not have to decide whether this evidence, in and of itself, would have been sufficient to support a finding of negligent design giving rise to a submissible case. The jury could properly consider her testimony along with the other evidence.

■■■ We conclude that the question whether the defendant exercised the proper degree of care under the circumstances, and the question of causation, were issues to be decided by the jury and should not have been preempted by the court. The jury was certainly not obliged to find negligence under the circumstances, but there was substantial evidence on which it could have made this finding. It follows that the judgment must be reversed and the cause remanded with directions to reinstate the judgment on the verdict for the plaintiff.

RENDLEN, C.J., HIGGINS, GUNN and BILLINGS, JJ., concur.

WELLIVER, J., dissents in separate opinion filed.

DONNELLY, J., dissents and concurs in separate dissenting opinion of WELLIVER, J.

HIGGINS, J., withdraws concurrence and joins in separate dissenting opinion of WELLIVER, J., on April 26, 1983.

WELLIVER, Judge, dissents.

I respectfully dissent.

The principal opinion cannot be read as doing anything other than imposing strict liability upon the owners of hotels and motels. The principal opinion concedes that nothing about the assailant's appearance would have given defendant cause to believe that the assailant might accost plaintiff or anyone else in the hotel. Its holding is grounded squarely upon the view that defendant should have foreseen that *someone* might attack a patron in the ladies' room at *some time*. It states:

> We agree that the defendant could not be found negligent on the basis of the assailant's presence in the hotel, *but only up to the point at which he entered the ladies' room.* Had his entry there been observed by a hotel employee, an immediate duty to take action would have arisen. But the entry was not observed.

(Emphasis added; footnote omitted.) The gist of that statement is that defendant had a duty to hire a permanent ladies' room attendant or initiate some other security measure that would effectively have deterred a man from entering the ladies' room. I find nothing in the facts developed at trial that would cause defendant to owe plaintiff such an extraordinary duty. Plaintiff's evidence regarding previous incidents at the hotel showed that there had been some prostitution; that young men, not guests of the hotel, had congregated on the lower level; that there had been some vandalism in the men's restroom on the lower level; that there had been thefts from automobiles in the parking garages; that "undesirables" had come into the hotel from a nearby bus station; and that there had been a bomb threat.

As a theoretical matter, anything is foreseeable. The law, however, must be tempered with a measure of practicality. Lt. Col. Warren testified that the area around defendant's hotel is one of comparatively low crime. Nothing about previous incidents at the hotel suggests that defendant had a reasonable basis for anticipating the attack of which plaintiff complains. In such a case defendant breached no duty owed to plaintiff.

I would affirm the judgment.