EDWARD BEFFA, Plaintiff-Appellee, v. TERMINAL RAILROAD ASSOCI-
ATION OF ST. LOUIS, Defendant-Appellant.

Fifth District   No. 5—88—0129

Opinion filed January 29, 1991.—Rehearing denied March 6, 1991.

Gundlach, Lee, Eggmann, Boyle & Roessler, of Belleville (Richard M. Roessler and Kenneth L. Halvachs, of counsel), for appellant.

Cook, Shevlin, Keefe & Ysursa, Ltd., of Belleville (Bruce N. Cook, of counsel), for appellee.

JUSTICE HOWERTON delivered the opinion of the court:

It happened in a high-crime area of St. Louis, Missouri, where Goodfellow Street passes under defendant's railroad bridge.

Goodfellow Street had been lowered and made into an underpass, and the bridge, which was formed by the tracks and a sidewalk, ran at ground level. The bridge was convenient for people living in a nearby housing project to use as a shortcut. The use was so heavy, and so well known, that the railroad's chief engineer testified:

"A. It is so frequent that there's very little we can do to prevent it."

This is an open railroad bridge; there is a five-inch or so gap between each railroad tie. A solid bridge deck has an enclosed bottom so, looking down, nothing below the solid decking can be seen. But on this open-decked bridge, looking down, Goodfellow Street can be seen through each gap between each tie. From Goodfellow Street looking up, railroad ties cast a prison-bar-like pattern across an empty sky.

Thirty years before it happened, the railroad had been warned in a letter to make the bridge deck solid and had been warned that the bridge was decaying.

Twenty-one years before it happened, the railroad's building department had been sent a letter from a woman who claimed that concrete had come off the bridge and damaged her car as she was passing under. The railroad's inspection gave "no indication that any concrete had spalled from the bridge recently."

Six days before it happened, defendant's assistant track supervisor had inspected the bridge. He testified that ties had rotted and tie-plates had come loose.

Tie-plates are 20-pound steel pieces that are laid on top of railroad ties. Railroad tracks are laid on top of the tie-plates. Spikes are driven, attaching tracks to tie-plates and tie-plates to railroad ties.

The railroad knew the bridge was in a high-crime area. The assistant track supervisor testified:

"Q. Are you personally—when you're in that area, are you careful?

A. Extra careful.

Q. Is it an area where—when you inspect it, are you by yourself?

A. No, sir.

Q. Would you—would you recommend that people go by themselves on inspection trips in this area?

A. No, sir.

Q. At day.

A. Any time.

Q. Are there vandals in the area all the time?

A. Yes, sir.

Q. How long have you known that?

A. Ever since I been working for the railroad."

Fencing, including barbed wire, could be used to keep people off the bridge, the railroad's special police acknowledged; however, defendant did not fence the bridge to keep people from using it as a shortcut. The railroad's chief engineer said fences would not work because, "the same people who trespass break the fences down."

The railroad knew that objects are thrown from bridges. Its assistant track supervisor testified:

"Q. You ever hear of any vandals getting on these bridges and throwing stuff on people below?

A. Yes, sir."

The problem of objects being thrown off bridges is widespread and recurrent. A Guide for Protective Screening of Overpass Structures, published by the American Association of State Highway Officials, was put into evidence, and the railroad's chief engineer was cross-examined thereon. That guide stated: "[I]n the Chicago area in 1964-65 there were over 1,200 reported incidents of objects being dropped or thrown from overpasses onto vehicles below."

This problem extended to this bridge. A St. Louis police officer testified to the danger:

"Q. Have you ever responded to incidents where there have been complaints of things falling or being dropped from that particular railroad bridge ***?

A. We averaged one to two serious injuries there approximately in the summertime, that's not counting the wintertime with snowballs and everything else."

Bridges can be screened to prevent them from being used as launching pads. The American Association of State Highway Officials' Guide for Protective Screening provides:

"Screens of various types can definitely reduce the number of incidents of objects being dropped from overpasses and striking

vehicles below. The addition of a screen or barrier should not be delayed until a serious incident definitely establishes a need for such a device."

According to the guide, screens should be considered on all overpasses in large urban areas used exclusively by pedestrians and not easily kept under surveillance by police.

The chief engineer was asked about screens:

"Q. [Why haven't you] screened this railroad bridge when you knew that kids played on the bridge all the time. Why didn't you screen it?

A. We have no screens on any railroad bridge that I know of."

He then was asked:

"Q. *** Does that make it all right ***?"

He answered:

"A. There's a lot of things that must be left to certain chances in life."

It happened sometime after 7 p.m., May 2, 1983, the time of day during that part of the year that daylight dies.

A St. Louis teacher had been to a burial team rehearsal. Leaving, she travelled north in the fading twilight, approaching the Goodfellow railroad overpass, and on the overpass she saw two or three children.

At the same time, Edward Beffa, a St. Louis police officer, was on patrol in his squad car with his partner, Robert Pizzella, in the area of the overpass. A police radio dispatch warned that someone was brandishing a shotgun in the area. Beffa positioned his squad car so he and his partner could respond if they were needed, and the squad car cruised in the gathering dusk toward the overpass.

The children, not seen by Beffa or Pizzella, but seen by the teacher, moved to the edge of the overpass.

As the squad car came under the overpass, something fell or was dropped from where the children were standing, and they ran.

A 20-pound, railroad tie-plate crashed through the squad car windshield and shattered Edward Beffa's lower face.

We affirm the jury's verdict for plaintiff, Edward Beffa, and against the railroad and hold: (1) defendant had a duty to protect plaintiff from the criminal acts of third persons under the circumstances of this case; and (2) plaintiff proved that defendant's conduct was the proximate cause of plaintiff's injury, and therefore, the circuit court did not err in refusing to enter judgment notwithstanding the verdict.

Robert Pizzella's case is not part of this appeal.

Defendant invites us to view this case as an intentional bombing of plaintiff's squad car. This invitation is expected because this view of the facts presents the case most favorably to defendant.

Plaintiff, on the other hand, points out, correctly, that the evidence also supports an inference that the tie-plate fell or was unintentionally knocked off the bridge, and that the negligence of defendant in maintaining the bridge created the condition on defendant's premises that caused the injury to plaintiff. Certainly the verdict is sustainable on that ground, but we accept defendant's invitation and address its argument.

■ Plaintiff was injured in Missouri, and the substantive law of Missouri applies. However, whether judgment notwithstanding the verdict should be granted is procedural not substantive (Restatement (Second) of Conflicts §127 (1971)), and therefore, we apply the Illinois test for granting judgment notwithstanding the verdict, namely: does all the evidence, when viewed in its aspect most favorable to the plaintiff, so overwhelmingly favor the railroad that no contrary verdict based on that evidence could ever stand? *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.

■ Although the test for the propriety of a judgment notwithstanding the verdict is procedural, negligence is a substantive issue and is determined by the law of the State that has the most significant relationship to the occurrence and the parties. Therefore, Missouri law governs the substantive question of negligence. See Restatement (Second) of Conflicts §145 (1971).

■ According to Missouri law, a defendant is negligent if that defendant: (1) had a duty to protect the plaintiff from the harm, (2) that duty was breached, and (3) the breach of duty proximately caused the plaintiff's injuries. *Virginia D. v. Madesco Investment Corp.* (Mo. 1983), 648 S.W.2d 881.

Defendant claims it owed plaintiff no duty and bases its argument on *Faheen v. City Parking Corp.* (Mo. App. 1987), 734 S.W.2d 270, 274. *Faheen* is a landlord-tenant case. The tenant died in a car bombing which occurred in the landlord's parking garage. Plaintiff's next friend alleged that the landlord negligently failed to provide adequate security to protect the tenants from criminal assaults. The court held that the landlord had no duty to protect plaintiff from the car bombing, because under the circumstances no reasonable person would have been put on notice to take precautions to protect against a criminal act, stating:

> "[A]lthough the case law and comments use terms such as 'foreseeability,' 'proximate cause,' and 'intervening cause,' the

final resolution of the issue is dictated by basic fairness and public policy. 'Whether a duty exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk and the public interest in the proposed solution.' " *Faheen*, 734 S.W.2d at 273, quoting *Goldberg v. Housing Authority of City of Newark* (1962), 38 N.J. 578, 583, 186 A.2d 291, 293.

The pivotal issue is whether, under the circumstances, a reasonable railroad would have had notice of need to protect passersby from harm hurled from above. Under *Faheen*, if the circumstances were insufficient to put defendant on notice, there would be no duty. If, on the other hand, the circumstances were sufficient to provide notice, defendant's duty could arise depending upon a weighing of the relationship of the parties, the nature of the risk and the public interest in the proposed solution. (*Faheen*, 734 S.W. 2d at 273.) In this case, defendant knew the bridge was in a high-crime area, knew that people used the bridge as a shortcut, knew objects were thrown from overpasses in general and knew that objects had fallen or been dropped from this particular overpass. Given the particular neighborhood and special facts of the case at bar, we believe the record supports the jury's determination that the railroad knew or should have known that failure to fence or screen the bridge would eventually result in harm to passersby. We further believe that the evidence supports a finding that the railroad could have screened or otherwise guarded the overpass at reasonable cost. Therefore, we hold that the railroad had a duty to protect plaintiff under the circumstances of this case.

Defendant, furthermore, is not relieved of liability by deeming the act of the children to be criminal under the doctrine of "intervening cause." As stated by the Missouri Supreme Court in *Zubher v. Clarkson Construction Co.* (Mo. 1952), 251 S.W. 2d 52:

"If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby." Restatement (Second) of Torts §449 (1965).

In the case at bar, the testimony showed that defendant either realized or should have realized that pedestrians dropped objects from the overpass and the testimony also showed that the bridge, as it disintegrated, might furnish the ammunition itself to those who were inclined to drop objects from the overpass onto those below.

Therefore, under these circumstances, the children's criminal act of dropping a tie-plate was not an intervening cause that would render plaintiff unable to prove proximate cause. See *Swindell v. J.A. Tobin Construction Co.* (Mo. App. 1981), 629 S.W. 2d 536.

■ Defendant, lastly, argues that the facts of this case are insufficient to prove that it had reasonable notice of the danger because there was an insufficient similarity between the earlier incidents and this incident, and points out that while this incident involved a 20-pound tie-plate, the earlier incidents involved rocks, snowballs and bits of concrete. We disagree. It is true that the nature of a snowball as a thrown object seems benign, while the nature of a 20-pound piece of steel seems lethal. But, under the circumstances of this case, both a snowball and this piece of steel are missiles of potential harm. It is not the nature of the object in the abstract that matters, it is the nature of the object in the matrix of all the circumstances that surround the event that is the concern, and the inquiry is whether, under the circumstances, the object carries a potential for harm that should be within the cognizance of a reasonable person. Rocks, snowballs, pieces of concrete of undescribed size, a 20-pound piece of steel thrown, dropped, or hurled from this bridge are all alike—a threat to the safety of those below. Defendant owed a duty to the public to use reasonable care in preventing its property from being used as a staging area for violence and those who travel in peace have a right to be protected by a bridge owner who is aware or has reason to know its bridge is being used as a public launching pad.

The circuit court is affirmed.

Affirmed.

RARICK, P.J., and CHAPMAN, J., concur.